B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**

*Johnny Ray Moore*

**DEFENDANTS**

FILED
2017 DEC 13 P 2:56
CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

17-5039

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

**ATTORNEYS** (If Known)

17.5039

**PARTY** (Check One Box Only)

☒ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor  ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)

☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor  ☐ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

The Debtor seeks to have all invalid mortgage liens removed off the land records in The City/Town of Shelton Connecticut regarding the location of the Debtor's primary residence. The Debtor has recently obtained certified Legal document (evidence) from the office of the City/town Clerk which renders these mortgages unenforceable. 28 USC § 158 11 USC § 558, 18 U.S.C. § 151, 11 USC § 1322 (b)(5), 11 USC § 549, Voilation of Common law principle Voilation of FDCPA, Voilation of CT LA

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
☐ 12-Recovery of money/property – §547 preference
☐ 13-Recovery of money/property – §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

**Other Relief Sought**

Based on this newly discovered evidence the Debtor Also seek to have the Allowance of Any proof of Claims voided.

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>*Johnny Ray Moore* | BANKRUPTCY CASE NO.<br>*16-51133* | |
| DISTRICT IN WHICH CASE IS PENDING<br>*Connecticut* | DIVISION OFFICE<br>*Bridgeport* | NAME OF JUDGE<br>*Julie A. Manning* |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>*December 13, 2017* | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>*Johnny Ray Moore* | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

IN RE:
JOHNNY RAY MOORE                          :    CASE NO. 16-51133 (JAM)
                                          :
            DEBTOR                        :    CHAPTER 13
_____          :
                                          :    DECEMBER 13, 2017
JOHNNY RAY MOORE                          :
                                          :    ADVERSARY PROCEEDING
            PLAINTIFF                     :    NO:
                                          :
VS.                                       :
                                          :
PENNYMAC LOAN SERVICING LLC               :
AKA PENNYMAC HOLDINGS LLC.,               :
JPMORGAN CHASE BANK, N.A.,                :
CHASE HOME FINANCING, LLC.,               :
FEDERAL DEPOSIT INSURANCE CORPORATION., :
AKA FDIC.,                                :
WASHINGTON MUTUAL HOME LOANS.,            :
HOMECOMING FINANCIAL                      :
MORTGAGE CAPITAL ASSOCIATES INC.,         :
MORTGAGE ELECTRONIC REGISTRATION          :
SYSTEMS, INC., AKA MERS                   :
HUNT LIEBERT JACOBSON P.C. aka .,         :
McCalla Raymer Leibert Pierce, LLC.       :
                                          :
            DEFENDANT'S                   :



### PLAINTIFF'S IN REM COMPLAINT AND ADVERSARY PROCEEDING COMMENCED  UNDER THE   FRBP RULE 7001 PURSUANT TO  PART VII

1.     Johnny Ray Moore, the Debtor, herein called ("the Plaintiff") files this Complaint and

Adversary Proceeding *in Rem* under the Federal Rules of Bankruptcy Procedure

("FRPB") Rule 7001 and governed by Part VII of the FRBP, to determine the Validity,

Priority ,or Extent of Lien(s) or other interest in property; to determine the release  of

invalid mortgage lien(s) in the making of the Plaintiff's open-end mortgage deed which consist of fatal material of misrepresentations committed under false pretense, false representation and actual fraud and renders the mortgage unenforceable and the Plaintiff seeking a declaratory judgment in order to have the liens voided and released.

2.                                    **JURISDICTION**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334; 28 U.S.C. § 157 (b) (1) ; and U.S.C. § 157 (b) (2) (J) , and Rule 7001 (2) (6) (9) of the Federal Bankruptcy Rules, and this matter is a core proceeding pursuant thereto.

## PARTIES

## THE PLAINTIFF

3.    Johnny Ray Moore, the Debtor called (the "Plaintiff") in the above-captioned matter, currently resides 15 Sachem Drive, Shelton Connecticut., herein called the Plaintiff's primary residence. The Plaintiff has resided at his primary residence since January 2007.

## THE DEFENDANT'S

4    The Defendant's are known as the follows:

5.    Pennymac Loan Servicing LLC., ("PLSL") aka Pennymac Holdings LLC., ("PHL"). PHL is a Loan Servicer for PLSL with an office and place of business at 1209 Orange Street, DE 19801.

6.    JPMorgan Chase Bank, N.A., herein called ("JPMCP") a banking corporation with an office and place of business at  270 Park Avenue,  New York 10017.

2-

7.    Chase Home Financing LLC., herein Called (CHF) a loan servicer subsidiary of JPMCP with an office and place of business at 3415 Vision Drive, Columbus, OH 43219-6009.

8.    Federal Deposit Insurance Corporation, herein called ("FDIC") a Federal Agency with an office and place of business at 550 17th nw (at F Street, NW), Washington D.C. 20429.

9.    Washington Mutual Home Loans, herein called ("WMHL") was a mortgage Lender with an office and place of business at 75 N Fairway Drive, Vernon Hills, IL 60061.

10.    Homecoming Financial LLC, herein called ("HFSL") was a Loan Servicer, having a previous office and place of business located at 8400 Normandale Lake Boulevard Suite 250, Minneapolis, MN 55437.

11.    Mortgage Capital Associates Inc., herein called ("MCA") is a mortgage lender with an office and place of business at 11150 W Olympic Blvd, Ste 1160, Los Angeles CA 90064.

12.    MERCORP Holdings, Inc., aka Mortgage Electronic Registration System, Inc., herein called ("MERS") is an organization for banking institutions that funds and purchases mortgage notes for the purposes of "*mortgage securitization*", while MERS maintains the  ownership interest in the mortgage deeds. MERS has an office and place of business at 1818 Library Street, Suite 300, Reston, VA 20190. Is a foreign corporation.

13.    Hunt Leibert and Jacobson PC., aka McCalla Raymer Leibert Pierce, LLC.,
herein called (the "Law Firm")  that commences foreclosures actions on behalf of MERS
with an office and place of business at 50 Weston Street, Hartford CT 06120.

14.  McCalla Raymer Leibert Pierce, LLC, is a Law Firm also has an address known as
1544 Old Alabama Road, Roswell, GA 30076.

## PLAINTIFF'S FACTS REGARDING A COPY OF THE NOTE

15.    The Plaintiff signed an Adjustable Rate Note in the Amount of $746,550.00 on
January 26, 2007 for a loan in order to purchase his primary residence.

16.    The Lender is stated to be "Mortgage Capital Associates, Inc.,   A California
Corporation ( foreign corportation).

17.    The Plaintiff was qualified for the loan base on a *negative amortization interest
rate of 1%.

18.    The loan was an adjustable rate mortgage, also known as an Option ARM. This
(subprime loan)  mortgage initially gave the Plaintiff 4 payment options per month.

19.    The first Payment Option was called the "*Minimum Payment*" which required a
payment of **$2,401.20** ( this option increased the loan balance because only a portion
of the interest payment was required to be paid each month).

20.    The Second Payment Option was called "Interest Only Payment" which required
a payment of **$4,525.09** (this payment would not increase the principle balance because
the required  minimum interest payment is covered each month).

4

21.    Third Payment Option was called "Fully Amortizing Payment" which required a payment of **$5,121.42** ( this option is considered a 30 year Amortizing payment which would reduce the principle).

22.    The fourth Payment Option was called a "15 Year Amortizing Payment" which required a payment of **$6,901.47** ( this payment would potential pay the mortgage off in 15 years). Please note that none of these payments where fixed. And none of these payments included property taxes and property insurance.

23.    The Plaintiff ask the Court to take judicial notice of a copy of the Plaintiff's Note, and notice that on page 2 of 6 under number(3) (B) of **Payments**. The Plaintiff's mortgage loan was underwritten  under the "*minimum payment*" option of $**2,401.00.**

24.    The Plaintiff was only initially required to pay $2,401.20 per month. This minimum payment  was–$2,111.14  short of the monthly interest due. This negative amortization loan continued to increase the Plaintiff's principle amount of the loan each month each month.

25.    The Plaintiff ask the Court to take judicial notice of the copy of the Plaintiff's Note on page 4 of 6 under number 7 (C)"*borrower's failure to pay as required*" The Note Holder is required to send out the Notice of Default for failure to pay minimum payment.

26.    The Plaintiff only understood that the "Lender" may transfer his Note. The Lender or anyone who takes the Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder" see page 1 of 6 under number (1) of the *Borrowers Promise to Pay.*

27.    The Plaintiff Note was claimed to be registered on the  Mortgage Electronic

Mortgage Registration System Inc., data base herein called ("MERS"). The MERS

system is suppose to track the ownership history of the parties interest with regards  to

the Plaintiff's  Note. MERS issues an Identification Number" which is assigned to both

the Note and Mortgage for tracking purposes.

28.    The MERS Identification Number assigned by MERS for the Plaintiff's First

Mortgage Loan in the amount of $746,550.00 is MIN: 100133-0100057337-4. The

Loan Number was 07010208. Please see **EXHIBIT A.** which is a copy of the Plaintiff's

Note (In support of the material facts stated in numbers 1-27).

## THE PLAINTIFF FACTS REGARDING THE OPEN-END MORTGAGE DEED

29.    The Plaintiff states that an Open-End Mortgage Deed was filed on the Land

Record in the City of Shelton, in the County of Fairfield, in the State of Connecticut in

**BK 02780 PG: 256-275**

30.    The Plaintiff states that the following material facts are declared in this security

instrument accordingly starting  in BK 02780  PG 255, under the letter  (C) "**MERS" is**

**acting soley as a nominee for Lender and Lender's successors and assigns.**

31.    The Plaintiff further states that **MERS is the mortgagee under this Security**

**Instrument**.

32.    The Plaintiff declares that this security instrument in BK 02780 PG 256 under the

letter (D) states that the **"Lender" is Mortgage Capital Associates, INC.**

6

33.    The Plaintiff declares on BK 02780 PG 256 under the letter (P) **that the Loan falls under Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) and it's implementation of  Regulation X (24 C.F.R. Part 3500). Also known as RESPA.**

34.    The Plaintiff declares that this security instrument in **BK 02780 PG 256** under the letter (Q) states " ***Successor in interest of Borrower***" means any party that has taken title (MERS) to the Property, whether or not that party has assumed Borrowers obligations under the Note and/or Security  Instrument.

35.    The Plaintiff declares that this security instrument in **BK 02780 PG 256** under

**"TRANSFER OF RIGHTS IN THE PROPERTY"**

"For the purpose, Borrower in consideration of this debt does hereby grant and convey to MERS ( soley as nominee for Lender and Lender's successors and assigns) <u>and to the successors and assigns of MERS (</u> with regards to the Plaintiff's primary residence.)

36.    The Plaintiff further declares the following claims made by MERS as the Plaintiff's primary residence in **BK 02780 PG 257 "TO HAVE AND TO HOLD** this property unto MERS ( soley as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrowers understands and

7

Agrees that MERS holds only legal title to the interest granted by the Borrower in this

Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee

for Lender and Lender's successors and assigns) has the right:  to exercise any or all of

those interests, including, but not limited to, the right to foreclose and sell the Property;

and to take any action required of Lender including, but not limited to, releasing and

canceling this Security Instrument.

37.     The Plaintiff claims that according to the Security Instrument in **BK 02780 PG**

**259**, number 5. **Property Insurance.** The Plaintiff is only required to maintain Property

Insurance coverage in the name of the Lender and the Lender's successors.

## <u>NON-UIFORM COVENANTS,</u>

38.     The Plaintiff ask the Court to take Judicial Notice in **BK 02780 PG 265**, number

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to
acceleration following Borrower's breach of any covenant or agreement in this
Security Instrument ( but not prior to acceleration under Section 18 unless
Applicable Law provides otherwise). The notice shall specify: (a) the default; (b)
the action required to cure the default; (c) a date, not less than 30 days from the
date the notice is given to Borrower, by which the default must be cured; and (d)
that failure to cure the default on or before the date specified in the notice may
result in acceleration of the sums secured by this Security  Instrument and
foreclosure or sale of the Property. The notice shall further inform Borrower of the
right to reinstate after acceleration and the right to assert in court the non-
existence of a default or any other defense to Borrower to accelartion and
foreclosure or sale. If the default is not cured on or before the date specified in
the notice, Lender at its option my require immediate payment in full of all sums
secured by this instrument without further demand and may invoke any of the
remedies provided in this Section 22, including, but not limited to reasonable
attorney's fees and cost of title evidence.**

8

39.    The Plaintiff ask the Court to take Judicial Notice of the Material Fact in BK

**02780 PG 269-275,** that the Adjustable Rate Rider attaching a copy of the Note to the

Mortgage is a separate and distinct copy of the other Note that the Plaintiff

signed. This Note consist of 5 pages and the other Note consist of 6 pages. Both Notes

are signed with different paper.  The MTA  INDEX for the Note that has six pages is

dated 10/1/05 and the MTA INDEX for the Note that has five  pages  is dated 2/24/06.

Both Notes reference the same loan number of 07010208. Please see a Certified Copy

of the Open-End Mortgage Deed reflecting the same MIN: 1001330-0100057337-4 of a

copy of the Plaintiff's Note.  Pease see **EXHIBIT B.**(in support of material facts declared

by the Plaintiff from numbers 28- 39).

### THE PLAINTIFF'S MATERIAL FACTS NOT APPEARANT ON THE RECORD

40.    The Plaintiff, prior to closing the mortgage loan on **January 26, 2007** was

Instructed by  Mortgage Capital Associates Inc., the stated "Lender" referenced in both

the Note and Mortgage. Informed the Plaintiff, that the Plaintiff could not close the

mortgage loan in the name of Mortgage Capital Associates Inc., herein called ("MCA").

41.    The Plaintiff was instructed prior to closing, the mortgage loan, that the Plaintiff

had to purchase a property insurance policy naming "Homecomings Financial as the

Plaintiff's Lender. Please see copy of **EXHIBIT C.**  (a copy of the instruction received by

MCA to change Lender status to Homecomings Financial LLC pursuant to property

insurance clause stated in the Security  Instrument in BK 02780 PG 259, number 5.

**Property Insurance).**

9

42.    The Plaintiff also declares that on the date of **January 26, 2007** the Plaintiff

received an **Assignment of Mortgage** from MCA. The Assignment of Mortgage

declares that both the Plaintiff Mortgage and Note was sold to MERS prior to the

date of January 26, 2007 the date of the Plaintiff's closing of the mortgage loan.  Please

see **EXHIBIT D**. a copy of the said Assignment of Mortgage that was never recorded on

the Land Records by MERS from MCA. But is nevertheless valid as to truth in lending.

43.    The Plaintiff also received at the closing on **January 26, 2017** a **Notice of**

**Assignment, Sale or Transfer of Servicing Rights.**

44.    The Debtor ask the Court to take judicial notice of the material facts that MCA

does not disclose in the Notice of Assignment, Sale or Transfer of Servicing Rights who

the Plaintiff's  Note is actually sold to having already disclosed to the Plaintiff that the

Note was sold to MERS.

45.    The Plaintiff declares that the Notice of Assignment, Sale or Transfer of Servicing

Rights stated that my present servicer was MCA. This is a material fact that the Debtor

is disputing to be  FALSE. MCA never held any interest in either the Note or Mortgage.

46.    The Plaintiff declares that the Notice of Assignment, Sale or Transfer of

Servicing Rights sole purpose was to set up for Homecomings Financial LLC as the

"Loan Servicer" and not the Lender, although MCA required that the Plaintiff purchase

such a property insurance policy.

*10*

47.     The Plaintiff is disputing the material fact that Homecomings Financial LLC was

never Plaintiff's  Lender but was only acting as a Loan Servicer for MERS. Please see

**EXHIBIT E.** (a copy of the Notice of Assignment, Sale or Transfer of Servicing Rights).

48.     The Plaintiff began to forward payments to Homecomings Financial as of March

1, 2007. Based on the Mortgage Statement from Homecomings Financial LLC the Court

can see the following factual material stated by the Plaintiff  in support of the

PLAINTIFF'S PREVIOUS FACTS STATED REGARDING A COPY OF THE NOTE
FROM  NUMBERS 15-27. THE MORTGAGE STATEMENT SHOWS THE
FOLLOWING.

a.     The Plaintiff minimum payment is $2,401.20.

b.     This payment is based on the 1% interest rate for under which the Plaintiff loan
was underwritten and approved for.

c.     The actual interest rate based on the statement is 7.25%. This is the interest rate
that the Plaintiff should have been under written and  qualified on the mortgage
loan, including taxes and insurance.

d.     The actual interest payment that was due was for $4,512.34

e.      As a result of the negative amortization loan -2,111.14 was added to the principal.

49.     The Plaintiff ask the court to please notice the other pay options listed in the

statement. Please see **EXHIBIT** F .

50.     The Loan Servicing Rights was transferred from Homecomings Financial, the

Plaintiff is not sure if this company is the same as Homecomings Financial LLC. The

Loan number was changed from 7442501532. The original loan number was 07010208.

//

50.     Washington Mutual began to service the Plaintiff's Note and the Plaintiff in the same year of 2007 began to make mortgage payments to Washington Mutual who assigned a new loan number of **5304282923.** Please see **EXHIBIT** $G$

51.     The Plaintiff in the year of 2008 paid over $45,679.48 to Washington Mutual in mortgage payments regarding the Plaintiff's primary residence. Please see **EXHIBIT** $H$ .

52.     The Plaintiff declares that Washington Mutual filed for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. The case was assigned to the Honorable Judge Mary F. Walrath.

53.     The FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") was appointed as the receiver of all assets and liabilities that were owned and operated by Washington Mutual.

54.     The FDIC and JPMorgan Chase Bank, N.A. entered into a purchase and assumption agreement dated September 25, 2008. According to the agreement between FDIC and JPMorgan Chase Bank, N.A., **on page 21 under According to Article IX of CONTINUING COOPERATION, Number 9.2 "Additional Title Documents":**

The agreement declares the following "The receiver, the corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal and equitable title in and to the property transferred pursuant to this Agreement or to  be transferred in accordance herewith. The Assuming Bank shall prepare such instruments and documents of conveyance ( in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Bank. The Assuming Bank shall be responsible for recording such instruments and documents of conveyance at its own expense.

55.    There is no Assignment of the Mortgage and Note from FDIC to JPMorgan Chase

Bank, N.A. ("Chase") transferring the Plaintiff's Note to Chase being necessary

In order to vest title of the mortgage to Chase. No Assignment of Mortgage was filed on

the Land Records in the City of Shelton, County of Fairfield State of Connecticut.

56.    The Plaintiff argues that Chase after the acquisition of the Assets of Washington

Mutual began to make claim to the Plaintiff's primary residence as the Court can see by

the 1099 the Plaintiff received from Washington Mutual? ( **EXHIBIT I** ).

57.    The Plaintiff continued to make mortgage payment to Washington Mutual as of

April 1, 2009. Please see **EXHIBIT  J**

58.    The Plaintiff continued to receive notices from Washington Mutual dated January

22, 2009, March 10, 2009 and August 17, 2009.  Please see **EXHIBIT K .**

## THE PLAINTIFF COMPLAINTS ARE AS FOLLOWS

### FIRST COUNT
### MORTGAGE CAPITAL ASSOCIATES INC. THE STATED LENDER

59.    The first material fact the Plaintiff is disputing is the material fact that Mortgage

Capital Associates Inc., ("MCA") did not lend the Plaintiff the $746,550.00. This is a fatal

material misrepresentation stating that MCA is the Lender in both the Note and

Mortgage  when in fact Mortgage Electronic Registration Systems Inc ("MERS") is listed

as the Primary "Lender" in the Open-End Mortgage Deed. This raises genuine issues of

material fact being disputed Plaintiff renders both the Note and Mortgage

unenforceable.

13

## THE SECOND COUNT
## THE CITY/TOWN CLERK OFFICE RECORDS OF MERS LISTED AS THE LENDER

60.    The second material fact the Plaintiff is disputing is the fact that both MERS and

MCA are listed as "Lenders" on the Land Records in city of Shelton, County of Fairfield,

State of Connecticut. In support of this material fact that was recently uncovered

by the Plaintiff. The Plaintiff ask the Court to Take Judicial Notice of a Notarized and

Certified Document the Plaintiff received from Margaret R. Domorod, City/Town Clerk

dated **November 15, 2017.** Please take Judicial Notice of the Notarized and certified

documents received from the City/Town Clerk **EXHIBIT** ⌐

## THE THIRD COUNT
## THE LEGAL DOCUMENT UNDISCLOSING FATAL MATERIAL FACTS

60    The third material fact now being disputed by the Plaintiff is the information

about MERS being recorded as a Lender in conjunction with Mortgage Capital

Associates Inc. is derived directly from the information record on the Public Land

Records with regards to The Index Page shown as (Exhibit A.) which explains the OR

Party being the Plaintiff and EE Party list both MERS and Mortgage Capital Associates

Inc., as the "LENDERS". In reference to (EXHBIT B.) being copies of the Plaintiff's first

and second mortgage.

## FOURTH COUNT
## MERS IS LISTED A THE PRIMARY LENDER

61.    The fourth material fact being disputed by the Plaintiff is that MERS is the

primary Lender and not MCA according to the information viewed on the Town Clerk

index pages and are extracted directly from the land record document at hand.

/4

## THE FIFTH COUNT
## THE CITY OF NEW HAVEN RECORDS LISTING MERS AS LENDER

62.     The fifth material fact being disputed by the Plaintiff is that the information about

MERS being a Lender has also been confirmed by the City Town Clerk of the City of

New Haven, Michael B. Smart. Please see the Plaintiff's Certified Copy of the Legal

Document dated **November 14, 2017.** Please see **EXHIBIT** M

**THE SIX COUNT**

63.     The six material fact being disputed by the Plaintiff has obtained written proof

that MERS funded the Plaintiff's loan with regards to the Plaintiff's real estate property

known as 83-85 Willis Street, New Haven CT 06511. This proof also validates the legal

Certified Document that the Plaintiff has received from the City Clerk of the City of New

Haven, Michael B. Smart.

## THE SEVENTH COUNT
## OFFICER OF THIS COURT LISTING MERS AS LENDER

63.     The seventh material fact being disputed by the Plaintiff is the document filed in

the United States Bankruptcy Court, District of Connecticut, Bridgeport Division by an

officer of this Court, by  Attorney Mark M. Kratter. Based on the information on the first

page list  at number 3, the Plaintiff's former counsel claimed the Money was lent by

MERS to fund his mortgage loan. Please see a certified copy of **EXHIBIT** N .

15

## THE EIGHT COUNT
## MERS ACTS LIKE A LENDER WITHOUT LEGAL AUTHORITY FROM THE
## CONNECTICUT DEPARTMENT OF BANKING

64.    The eight material fact being disputed by the Plaintiff is that not only is MERS

recorded as a Lender in the City of  Shelton as it pertain to the Plaintiff primary

residence. Or that  MERS is also listed as the Lender in New Haven and Stratford and

Bridgeport. Or that MERS also buys back the loans its funds for mortgage back

securitization purposes, based on the Assignments of Mortgage the Plaintiff received

from MCA at his closings. Claiming both the Note and Mortgage was sold and assigned

to MERS. But MERS  has also verified these material facts having filed a Release of

Mortgage claiming ownership prior Mortgage that was funded by New Century.

According to the Release of Mortgage MERS claims ownership of the Debt regarding

the Plaintiff property in the Town of Stratford, Count of Fairfield, State of Connecticut BK

3005 PG 205. Please see Certified Copy of Document filed on the Land Records

**EXHIBIT** ___O___.

## THE NINTH COUNT
## MERS LACKS STANDING AS WELL AS ALL PARTIES SEEKING TO
## FORECLOSE THE PLAINTIFF MORTGAGE TO MERS.

65.    The Plaintiff disputes these material rights claimed by MERS to commence

foreclosure actions, to foreclose on the Plaintiff primary residence and sell the Plaintiff's

Primary property or any other property owned by the Plaintiff with regards to a MERS

mortgage transaction pursuant to what MERS claims under this security instrument  in

**BK 02780 PG 257 "TO HAVE AND TO HOLD listed at the Plaintiff number 36**.

## THE TENTH COUNT
## JPMORGAN CHASE BANK N.A. LACKS  STANDING TO FORECLOSE THE
## PLAINTIFF MORTGAGE ON BEHALF OF MERS

66.     The Plaintiff is disputing the material facts claiming that JPMorgan Chase Bank,

N.A. lacks STANDING to foreclose on the Plaintiff Mortgage to MERS. Having alleged in

its Complaint and Lis Pendency that MERS was acting as the nominee on behalf of

MCA when on October 9, 2009 MERS commenced its action through JPMorgan Chase

Bank N.A. in order to foreclose on the Plaintiff's Mortgage. Please see **EXHIBIT** .

## THE ELEVENTH COUNT
## ASSIGNMENT OF MORTGAGES ISSUED BY MERS

67.     The Plaintiff is disputing the material facts of this Assignment of Mortgage

issued by MERS to be  a nullity because MERS never transfer the NOTE, having also

claimed to be acting on the authority as nominee for MCA who never held any interest in

the Plaintiff's Note or Mortgage. also considering Truth in Lending of the claim made to

the Plaintiff by  MCA  having claimed to have sold both the Note and Mortgage to MERS

prior to the Plaintiff closing the loan on January 26, 2007. **EXHIBIT**

## THE TWELVETH COUNT
## CLOUDED, BROKEN AND CORRUPTED CHAIN OF TITLE
## *PURSUANT TO CONNECTICUT GENERAL STATUTE SECTION 47-33C

66.     The Plaintiff is disputing the material fact that MERS has corrupted the

Plaintiff's Chain of Title in violation of the above listed statute rendering the Plaintiff's

property unmarketable

## THE THIRTEEN COUNT
## PLAINTIFF DISPUTE OF CORRUPTED TITLE SUPPORT BY WAY OF AFFIDAVIT

**67.**        The Plaintiff disputes the corruption of his mortgage by way of the following

Affidavit of John L. O'Brien Jr. an Public official Register of Deeds for the Common

wealth of Massachusetts and division of the office of the Secretary of the

Commonwealth. A reputable  Affiant. Declares that the Plaintiff Chain of Title has been

corrupted by the signature of Margaret Dalton an alleged employee of JPMorgan Chase

Bank, N.A. Please see **EXHIBIT** R .

## THE FOURTEENTH COUNT
## FUTHER CORRUTPION OF PLAINTIFF TITLE BY MERS

68.        The Plaintiff disputes serious material fact of corruption by MERS in the filing

of another Assignment of Mortgage  claiming again to be acting on behalf of MCA and

filing such a document on the Land Record in the City of Shelton, County of Fairfield,

State of Connecticut.  This Assignment Of Mortgage now claims to transfer the Plaintiff

Note to JPMorgan Chase Bank N.A. some 5.2 years later after the commencement of

the action in State Court. **EXHIBIT** S

## THE FIFTEEN COUNT
## UNLICENSED LENDER CONNECTIUCT GENERAL STATUTES UNDER OUR
## BANKING LAWS PROHIBITS UNLISCENSED LENDERS FOR ISSUING
## MORTGAGE LOANS

69.        The Plaintiff disputes the material fact  that any loan funded by a unlicensed

Lender operating here in the State of Connecticut is in violation of our State of

Connecticut Banking Law under Connecticut General Statute Section 36a -488  is

VOIDABLE and can not  be enforced against  the Plaintiff Mortgage

/ 7

## THE SIXTEEN COUNT

## MERS AS A LENDER  IS TRANSACTING  BUSINESS WITHOUT AUTHORITY IN VIOLATION OF CONNECTICUT GENERAL STATUTE SECTION 33-921

70.    The Plaintiff disputes the material the fact that MERS as the Plaintiff's Lender

having funded the Plaintiff Mortgage loans is operating in the State of Connecticut

without Authority in violation of CGS Section 33-921 and is prohibited without a

certificate of authority may not maintain a proceeding in any court in this STATE of

CONNECTICUT. Please see **EXHBIT** __T__ .

## THE SEVENTENTH COUNT

MERS, JPMORGAN CHASE BANK, N.A. PENNYMAC HOLDING LLC
IS HEREBY PUT ON NOTICE THAT IT IS A VIOLATION OF CGS SECTION 53-139
TO COMMITT FORGERY.

71.    The Plaintiff disputes the material fact that of all the FRUADULENT pleadings

and  that JPMorgan Chase Bank N.A. and or PennyMac Loan Servicing LLC aka Penny

Mac Holding LLC in an attempt to show STANDING the bottom  line  and the goal of the

LAW FIRM and of All the Attorney's that have participated in this foreclosure action is to

REPRESENT MERS WHO IS THE REAL PARTY IN INTERET SEEKING TO

FORECLOSE  ON THE PLAINTIFF'S MORTGAGE. LIKE IT FRAUDULENT DID IN

NEW HAVEN. PLEASE SEE **EXHIBIT** __U__

18

**WHEREFORE,** for all the disputed Material raised in the Plaintiff's Complaint form 1-17 the Plaintiff seeks the following RELIEF.

72.    The Plaintiff seeks $200,000 in monetary relief for all of the emotional distress and stress MERS and all parties acting on behalf of MERS in order to foreclose the Plaintiff Mortgage to MERS has cause the Plaintiff in just defense of this action.

73    The Plaintiff seeks the voidance of the Mortgage Liens. The liens are invalid, have Corrupted the Plaintiff Title and should be removed.

74.    The Plaintiff is also open to an equitable resolution in order to bring this matter to an end. The Plaintiff is now going to the doctors and prays that he is in good health do to the emotional stress Plaintiff has had to endure as a result of this forgery.

Dated _____

THE PLAINTIFF,

By: _____
Johnny Ray Moore, Pro Se
15 Sachem Drive
Shelton CT 06484
greenenergyjrm@gmail.com
(203) 395-4282

19

## CERTIFICATE OF SERVICE

In accordance with the applicable provisions of the Federal Rules of Bankruptcy Procedure 2002 and 7004, the undersigned certifies that on the December    , 2017 the following documents were served on the U.S.Trustee and all appearing parties via electronic mail and by *first class mail on the parties listed below:


Documents Served:

    1.    The Debtor's Summons and Complaint and Adversary Proceeding

Mark L. Bergamo, Esq.
The Marcus Law Firm
ATTYS For Tower Lien LLC
275 Branford Road
North Branford, CT 06471
mbergamo@marcuslawfirm.com
*claim* no. 2

Mark L. Bergamo, Esq.
The Marcus Law Firm
ATTYS For US Bank,
National Association as Custodian
for Tower DBW VI 2016-1 Trust
 275 Branford Road
North Branford, CT 06471
mbergamo@marcuslawfirm.com
*claim* no. 3

Matthew K. Beatman, Esq.
Zeisler and Zeisler
ATTYS For Hampshire House
Condominium  Association of Unit
Owners, Inc.
10 Middle Street
15th Floor
Bridgeport, CT 06604
MBeatman@zeislaw.com
*claim* no. 4

Juda J. Epstein, Esq.
Law Offices of Juda J. Epstein
ATTYS For Water Pollution
Control Authority for the City of
Bridgeport
3543 Main Street
Second Floor
Bridgeport, CT 06606
contact@lawofficesjje.com
*claim* no. 6

20

Linda St. Perre, Esq.
ATTYS For Bank of America, N.A.
Bankruptcy Dept.
McCalla Raymer Leibert Pierce, LLC
50 Weston Street
Hartford, CT 06120
bankruptcy@huntleibert.com
mrozea@leopldassociates.com
claim no. 7

Linda St. Pierre, Esq.
ATTYS For PennyMac Holdings, LLC
McCall Raymar Leibert Pierce, LLC
50 Weston Street
Hartford, CT 06120
bankruptcy@huntleibert.com
(alleged) claim no. 11

Roberta Napolitano
10 Columbus Boulevard
Hartford, CT 06106
rnapolitano@wwinslaw.com
rnapolitano@ch13rn.com
(*Trustee*)

Patricia A.Davis, Esq. For
The Bank of New York, FKA
The Bank of New York Mellon, as Trustee
for the certificate holders of the  CWABS
Series 2006-12   (alleged) claim no.
pdavis@mlg-defaultlaw.com

Linda St. Pierre, Esq.
ATTYS For Bank of America
McCalla Raymer Leibert Pierce, LLC
50 Weston Street
Hartford, CT 06120
bankruptcy@huntleibert.com
mrozea@leopldassociates.com
claim no. 9

Victoria L. Forcella, Esq.
ATTYS For JPMorgan Chase Bank, N.A.
McCalla Raymar Leibert Pierce, LLC
50 Weston Street
Hartford, Connecticut 06120
vforcella@huntleibert.com
(alleged) claim no. 14

Holley Claiborn, Esq.
U.S. Trustee
Office of the U.S.Trustee
Giaimo Federal Building
150 Court Street 302
New Haven CT 06510
USTPRegion02.NH.EFC@USDOJ.GOV

Mike Mckeon FOR
Regional Water Authority
90 Sargent  Drive
New Haven, CT 06515

21

Blong Van For
Ally Bank
P.O.Box 130424
Rosenville MN 55113-0004
claim no. 1

Kimberly Wall
For Frontier Communication
Bankruptcy Dept.
19 John Street
Middletown, NY 10940
claim no. 8

Mr. Andrew Kussmeaul, For
The Bank of New York Mellon, FKA
The Bank of New York Mellon, as Trustee
for the certificates holders of the CWABS
Inc., Asset-Back Certificates,
Series 2006-12
c/o Specialized Loan Servicing LLC
8742 Lucent Blvd, Suite 300
Highlands Ranch, Colorado 80129
POCInquiries@BuckleyMadole.com
(alleged) claim no.12

Michael P. D'Amico, Esq
112 Hemmingway Avenue
East Haven, CT 06512
michaelpatrickdamico@gmail.com
c/o The Bank of New York Mellon, FKA
The Bank of New York Mellon, as Trustee
for the certificates holders of the CWABS
Inc., Asset-Back Certificates,
Series 2006-12
(alleged) claim no. 12

Mr. Andrew Kussmeaul, For
Residential Funding Mortgage
Securities II, Inc. Home Equity Loan Pass
-Through Certificates, Series 2007-HSA2,
U.S.Bank National Association, as
Trustee, successor in interest to Bank of
America N.A., as Trustee, successor by
merger to LaSalle Bank National
Association, as Trustee
c/o Specialized Loan Servicing LLC
8742 Lucent Blvd, Suite 300
Highlands Ranch, Colorado 80129
POCInquiries@BuckleyMadole.com
(alleged) claim no.10

Patricia A. Davis, Esq. For
The Bank of New York Mellon, FKA
The Bank of New York Mellon, as Trustee
for the certificate holders of the CWABS
Inc., Asset-Back Certificates,
Series 2006-12
275 West Natick Road, Suite 500
Warwick, RI 02886
(alleged) claim no. 12

Michael P. D'Amico, Esq
112 Hemmingway Avenue
East Haven, CT 06512
michaelpatrickdamico@gmail.com
ATTYS FOR
Bank of Amercia
claims no. 7 and 9

22

Tamara Kirby For
New Haven City Tax Collector
165 Church Street
New Haven CT 06510
claim no. 13

Lori Jo For
Century Financial Services, Inc.
also D/B/A
Century Healthcare Serv. Collections
23 Maiden Lane
North Haven, CT 06473-0098

In accordance with the applicable provisions of the Federal Rules of Bankruptcy Procedure 2002 and 7004, the undersigned certifies that on the December   , 2017 the following documents were served on the U.S.Trustee and all appearing parties via electronic mail and by *first class mail on the parties listed below:

*Pennymac Loan Servicing LLC., ("PLSL") aka Pennymac Holdings LLC., with an office and place of business at 1209 Orange Street, DE 19801.

*JPMorgan Chase Bank, N.A.,  place of business at  270 Park Avenue,  New York 10017.

* Chase Home Financing LLC., place of business at 3415 Vision Drive, Columbus, OH 43219-6009.

* Federal Deposit Insurance Corporation, place of business at 550 17th nw (at F Street, NW), Washington D.C. 20429.

*Washington Mutual Home Loans, place of business at 75 N Fairway Drive, Vernon Hills, IL 60061.

*Homecoming Financial LLC, place of business located at 8400 Normandale Lake Boulevard Suite 250, Minneapolis, MN 55437.

*Mortgage Capital Associates Inc., herein called ("MCA") is a mortgage lender with an office and place of business at 11150 W Olympic Blvd, Ste 1160, Los Angeles CA 90064.

23

*MERCORP Holdings, Inc., aka Mortgage Electronic Registration System, Inc.,

place of business at 1818 Library Street, Suite 300, Reston, VA 20190.

*Hunt Leibert and Jacobson PC., aka McCalla Raymer Leibert Pierce, LLC., place of

business at 50 Weston Street, Hartford CT 06120.

*McCalla Raymer Leibert Pierce, LLC, is a Law Firm also has an address known as

1544 Old Alabama Road, Roswell, GA 30076.


Dated _____

THE PLAINTIFF,

By: _Johnny Ray Moore_

Johnny Ray Moore, Pro Se
15 Sachem Drive
Shelton CT 06484
greenenergyjrm@gmail.com
(203) 395-4282

24

EXHIBIT A

 

MIN: 1001330-0100057337-4         Loan Number: 07010208

# ADJUSTABLE RATE NOTE
### Payment Option



THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

JANUARY 26, 2007          WEST LOS ANGELES          CALIFORNIA
        [Date]                        [City]                        [State]

15 SACHEM DRIVE, SHELTON, CONNECTICUT 06484
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 746,550.00         (this is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note. Lender is MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

I will make all payments under this Note in the form of cash, check, or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

**(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of      1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)   Interest Rate Change Dates**

The interest rate I will pay may change on the   1st  day of  MARCH, 2007          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

**(C)   Interest Rate Limit**

My interest rate will never be greater than      9.950 %.

**(D)   Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05                              Page 1 of 6

DocMagic *eForms* 800-649-1362
www.docmagic.com

_JKM_



If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(E)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 25/100 percentage point(s) ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

3.  **PAYMENTS**

(A)  Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the  1st  day of each month beginning on MARCH 1, 2007  . I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on FEBRUARY 1, 2037  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064

or at a different place if required by the Note Holder.

(B)  Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $ 2,401.20  , until a new Minimum Payment is required as provided below.

(C)  Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the  1st  day of MARCH, 2008  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

(E)  Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this

DocMagic ℮Forms 800-649-1362
www.docmagic.com

JKM

difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

(F)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

(G)   Required Full Payment

Regardless of the Payment Change Cap, on the **fifth** Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

(H)   Payment Options

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

(I)   Failure to Make Adjustments

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4.   NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA                    Page 3 of 6
10/01/05

DocMagic eForms 800-649-1362
www.docmagic.com

JRM



**5.   BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
    (A)   Late Charges for Overdue Payments
    If the Note Holder has not received at least the full amount of any Minimum Payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.
    (B)   Default
    If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.
    (C)   Notice of Default
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
    (D)   No Waiver By Note Holder
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
    (E)   Payment of Note Holder's Costs and Expenses
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05

Page 4 of 6

DocMagic *eForms* 800-649-1362
www.docmagic.com

JRM

29



**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, *protects the Note Holder from possible losses* that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05

Page 5 of 6

*DocMagic eForms* 800-649-1362
www.docmagic.com

JRM

30

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Johnny Ray Moore_ (Seal)
JOHNNY RAY MOORE            -Borrower

_____ (Seal)
                   -Borrower

_____ (Seal)
                   -Borrower

_____ (Seal)
                   -Borrower

_____ (Seal)
                   -Borrower

_____ (Seal)
                   -Borrower

*[Sign Original Only]*

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05                    Page 6 of 6

DocMagic *eForms* 800-649-1362
www.docmagic.com

31

Borrower

# PREPAYMENT ADDENDUM TO NOTE

Loan Number: 07010208

Date: JANUARY 26, 2007

Borrower(s): JOHNNY RAY MOORE

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this **26th** day of **JANUARY, 2007** , and is incorporated into and shall be deemed to amend and supplement that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

("Lender") and dated the same date as this Addendum. Repayment of the Note is secured by a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date as this Addendum. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

Section **5** of the Note is amended to read in its entirety as follows:

**5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase. If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within TWENTY-FOUR ( 24 ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX ( 6 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

JRM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

_Johnny Ray Moore_ 1/26/07
Borrower JOHNNY RAY MOORE    Date

Borrower _____ Date

_____    _____
Borrower                Date        Borrower                Date

_____    _____
Borrower                Date        Borrower                Date

EXHIBIT $B$

3 3

After Recording Return To:
MORTGAGE CAPITAL ASSOCIATES, INC.
11150 WEST OLYMPIC BOULEVARD, #1160
WEST LOS ANGELES, CALIFORNIA 90064
Loan Number: 07010208

BK: 02780 PG: 255
Inst# 674

——————————— [Space Above This Line For Recording Data] ———————————

## OPEN-END MORTGAGE DEED

**MIN:** 1001330-0100057337-4

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated   JANUARY 26, 2007        , together
with all Riders to this document.
**(B)** "Borrower" is JOHNNY RAY MOORE

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security
Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "Lender" is   MORTGAGE CAPITAL ASSOCIATES, INC.

Lender is a   CALIFORNIA CORPORATION, IT'S SUCCESSORS AND/OR ASSIGNS        organized
and existing under the laws of   CALIFORNIA
Lender's address is   11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS
ANGELES, CALIFORNIA 90064

**(E)** "Note" means the promissory note signed by Borrower and dated   JANUARY 26, 2007
The Note states that Borrower owes Lender   SEVEN HUNDRED FORTY-SIX THOUSAND FIVE
HUNDRED FIFTY AND 00/100        Dollars (U.S. $ 746,550.00        ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
FEBRUARY 1, 2037        .
**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      DocMagic *eForms* 800-649-1362
Form 3007 01/01                          Page 1 of 13                              www.docmagic.com

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF
THE ORIGINAL DOCUMENT RECEIVED FOR RECORD
IN THE OFFICE OF THE CITY/TOWN CLERK OF THE

CITY OF SHELTON ON 1/30/2007 AT 2:17PM

ATTEST: _____
             ASST. CITY/TOWN CLERK

34

BK: 02780 PG: 256
Inst# 674

**(H)**  **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☒ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☒ Other(s) [specify] |
| | PREPAYMENT RIDER TO SECURITY INST |

**(I)**  **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)**  **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)**  **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)**  **"Escrow Items"** means those items that are described in Section 3.

**(M)**  **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)**  **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)**  **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**  **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)**  **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the                 COUNTY                 of                 FAIRFIELD                 :
                    [Type of Recording Jurisdiction]                               [Name of Recording Jurisdiction]

3 5

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: MAP 159 LOT 50

BK: 02780 PG: 257
Inst# 674

which currently has the address of   15 SACHEM DRIVE

[Street]

SHELTON                     , Connecticut   06484      ("Property Address"):
[City]                                      [Zip Code]

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**  Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency.  However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.  If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim

*36*

BK: 02780 PG: 258
Inst# 674

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                                           Page 4 of 13                    *DocMagic eForms* 800-649-1362
                                                                                            www.docmagic.com

*37*

BK: 02780 PG: 259
Inst# 674

in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any

*38*

C3007.mzd

BK: 02780 PG: 260
Inst# 674

form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.  If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim.  The 30-day period will begin when the notice is given.  In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property.  Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

BK: 02780 PG: 261
Inst# 674

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

C3007.mzd

*40*

BK: 02780 PG: 262
Inst# 674

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

41

C3007.mrd

BK: 02780 PG: 263
Inst# 674

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

BK: 02780 PG: 264
Inst# 674

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require**

44

BK: 02780 PG: 266
Inst# 674

immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
JOHNNY RAY MOORE          -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                    -Borrower

Signed, sealed and delivered in the presence of:

_____          _____
Witness: Joseph Plame            Witness: Mark A. Kirsch

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                              Page 12 of 13

DocMagic eForms 800-649-1362
www.docmagic.com

C\3007.mzd          45

BK: 02780 PG: 267
Inst# 674

# SCHEDULE A

## PROPERTY DESCRIPTION

ALL THAT CERTAIN piece or parcel of land, together with the buildings and improvements thereon, situated in the City of Shelton, County of Fairfield and State of Connecticut, being shown and designated as Lot No. 25 on a certain map entitled, "Record Subdivision Plan Vistas at White Hills East Village Road, Sachem Drive & Sagamore Road Situated in City of Shelton, Connecticut", prepared by Eastern States Engineering, Inc., Scale 1"=100', Date: 4-02-04, which map is on file in the Shelton Town Clerk's Office as Map No. 4110, to which reference may be had for a more particular description thereof.

46

State of Connecticut
County of  FAIRFIELD              ss: Trumbull

The foregoing instrument was acknowledged before me this  January 26, 2007
JOHNNY  RAY  MOORE

Signature of Person Taking Acknowledgment

Joseph F. Varrone, Jr.

Commissioner of the Superior Court
Title

_____

Serial Number, if any

(Seal)

My commission expires

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic €Form 800-649-1362
Form 3007 01/01                          Page 13 of 13                          www.docmagic.com

BK: 02780 PG: 269
Inst# 674

Loan Number# 000208

# ADJUSTABLE RATE RIDER
## Payment Option

THIS ADJUSTABLE RATE RIDER is made this  26th day of  JANUARY, 2007          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to  MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

15 SACHEM DRIVE, SHELTON, CONNECTICUT 06484

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.  THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2.  INTEREST
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of     1.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.
**(B) Interest Rate Change Dates**
The interest rate I will pay may change on the  1st  day of  MARCH, 2007          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.  Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.
**(C) Interest Rate Limit**
My interest rate will never be greater than      9.950 %.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                          Page 1 of 5                          DocMagic eRunner 800-649-1362
www.docmagic.com

BK: 02780 PG: 270
Inst# 674

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000                        percentage point(s) (     2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

**3.   PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the          1st          day of each month beginning on MARCH 1, 2007                . I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on FEBRUARY 1, 2037          , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064

or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $ 2,401.20                        , until a new Minimum Payment is required as provided below.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the 1st   day of MARCH, 2008                , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date."  My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                    Page 2 of 5          DocMagic eForms 800-649-1362
www.docmagic.com

BK: 02780 PG: 271
Inst# 674

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G) Required Full Payment**

Regardless of the Payment Change Cap, on the  fifth  Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

50

BK: 02780 PG: 272
Inst# 674

    **(ii) Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

    **(iii) 15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

    <u>Payment Options will only be available if they are greater than the Minimum Payment.</u>

    **(I) Failure to Make Adjustments**

    If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4. NOTICE OF CHANGES**

    The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

    Uniform Covenant 18 of the Security Instrument is amended to read as follows:

    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

---

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                Page 4 of 5

DocMagic *eForms* 800-649-1362
www.docmagic.com



BK: 02780 PG: 273
Inst# 674

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
JOHNNY RAY MOORE          -Borrower                                            -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                            -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                            -Borrower

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06          Page 5 of 5          DocMagic eRorms 800-649-1362
www.docmagic.com

Usrpom.rfc          52

BK: 02780 PG: 274
Inst# 674

# PREPAYMENT RIDER

Loan Number: 07010208

Date: JANUARY 26, 2007

Borrower(s): JOHNNY RAY MOORE

THIS PREPAYMENT RIDER (the "Rider") is made this 26th   day of JANUARY          ,
2007                       , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

("Lender").  The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

15 SACHEM DRIVE, SHELTON, CONNECTICUT 06484

[Property Address]

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.    PREPAYMENT CHARGE
The Note provides for the payment of a prepayment charge as follows:

### 5   .  BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE
I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment."  When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so.  I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note.  However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.
If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment.  However, any reduction due to my partial Prepayment may be offset
by an interest rate increase.  If this Note provides for a variable interest rate or finance
charge, and the interest rate or finance charge at any time exceeds the legal limit under

---

MULTISTATE PREPAYMENT RIDER
6/03                        Page 1 of 2                        DocMagic *eFoRMS* 800-649-1362
www.docmagic.com

Usor.ppf

BK: 02780 PG: 275
Inst# 674

which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within TWENTY-FOUR ( 24 ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX ( 6 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.


_Johnny Ray Moore_____ (Seal)          _____ (Seal)
JOHNNY RAY MOORE         -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower


MULTISTATE PREPAYMENT RIDER
6/03                              Page 2 of 2              DocMagic *eFormss* 800-649-1362
                                                          www.docmagic.com


Received for Record   1/30/2002
At 2 H. 17 H⁰ ____ M. and Recorded by
_Diana Barry_____Ass't Town Clerk

# EXHIBIT C

# EXHIBIT _D_

56

WHEN RECORDED MAIL TO:

MORTGAGE CAPITAL ASSOCIATES, INC.
11150 WEST OLYMPIC BOULEVARD, #1160
WEST LOS ANGELES, CALIFORNIA 90064
Loan Number: 07010208


INSTRUMENT PREPARED BY:

─────────────────────[Space Above This Line For Recording Data]─────────────────────

# ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED,     MORTGAGE CAPITAL ASSOCIATES, INC. ITS SUCCESSORS
AND ASSIGNS, HEREBY ASSIGNS AND TRANSFERS TO MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., ITS SUCCESSORS AND ASSIGNS, P.O. BOX 2026
FLINT, MICHIGAN 48501-2026, ALL ITS RIGHT, TITLE AND INTEREST IN AND
TO A CERTAIN MORTGAGE EXECUTED BY JOHNNY RAY MOORE TO MORTGAGE CAPITAL
ASSOCIATES, INC.

and bearing the date of the     JANUARY 26, 2007
and recorded as Instrument No.                          concurrently herewith on
in book                      , page                          , of Official Records in the County Recorder's office of
CONNECTICUT                  County,  FAIRFIELD                          , describing land therein as:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: MAP 159 LOT 50


Commonly known as:  15 SACHEM DRIVE, SHELTON, CONNECTICUT 06484

Assessor's Parcel #: MAP 159 LOT 50
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest,
and all rights accrued or to accrue under said Mortgage.  The original principal amount due thereon this note(s) is
$ 746,550.00                 .                   MORTGAGE CAPITAL ASSOCIATES,
                                                 INC., A CALIFORNIA
                                                 CORPORATION
By: _____   By: _____

Name: _____   Name: _____

Title: _____   Title: _____


Attest _____

# EXHIBIT _E_

Loan Number: 07010208

# NOTICE OF ASSIGNMENT, SALE OR TRANSFER
# OF SERVICING RIGHTS

You are hereby notified* that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from   MORTGAGE CAPITAL ASSOCIATES, INC.

to

, effective  MARCH 1, 2007          .

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before this effective date of transfer, or at closing.  Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.  In this case, the present servicer and the new servicer have combined all necessary information in this one notice.

Your present servicer is  MORTGAGE CAPITAL ASSOCIATES, INC.

If you have any questions relating to the transfer of servicing from your present servicer call our servicing department at (310)477-6877          between  8:30  a.m. and  5:00  p.m. on the following days: Monday through Friday.

Your new servicer will be  HOMECOMINGS FINANCIAL, LLC

The business address for your new servicer is:   P.O. BOX 890036, DALLAS, TEXAS 75389

The toll-free or collect call telephone number of your new servicer is  (800)206-2901  . If you have any questions relating to the transfer of servicing to your new servicer call  CUSTOMER SERVICE                                  at (800)206-2901          between  9:00  a.m. and  5:00  p.m. on the following days: Monday through Friday.

The date that your present servicer will stop accepting payments from you is   MARCH 1, 2007
The date that your new servicer will start accepting payments from you is   MARCH 1, 2007
You should also be aware of the following information, which is set out in more detail in Section 6 of RESPA (12 U.S.C. §2605):

During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. §2605) gives you certain consumer rights.  If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request.  A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request.  Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute.  During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day, excluding legal public holidays (State or Federal), Saturday and Sunday.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.  You should seek legal advice if you believe your rights have been violated.

## BORROWER ACKNOWLEDGMENT

I/We have read this disclosure form, and understand its contents, as evidenced by my/our loan signature(s) below.

| _Johnny Ray Moore_ | | | |
|---|---|---|---|
| Borrower   JOHNNY RAY MOORE | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

* This notification is a requirement of section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. §2605).

# EXHIBIT F

60

**Homecomings Account Statement**

| CUSTOMER INFORMATION | PROPERTY ADDRESS | **Homecomings Financial** |
|---|---|---|
| | | *A GMAC Company* |
| Name:   JOHNNY RAY MOORE | 15 SACHEM DRIVE | |
| | SHELTON   CT 06484 | |
| Account Number:   7442501532 | | Visit us at www.homecomings.com for |
| Home Phone #:   (203)877-9089 | | account information or to apply on-line. |

9518AR 02/06/07 08:30 0001628 20070514 GE197101 HOARM   1 OZ DOM GE19710000* 146316   HO

#BWNHJPY
#KW75659J58539#

||lllll||lll|ll|lll|ll|l||llll||ll|l|llll||lllll||l

JOHNNY RAY MOORE
15 SACHEM DRIVE
SHELTON CT 06484-1756



| Customer Care Inquiries:   1-800-206-2901 |
|---|
| Home Financing Needs:   1-877-695-3633 |

Please verify your mailing address, borrower and co-borrower information. Make necessary corrections on this portion of the statement, detach and mail to address listed for Inquiries on the reverse side.

---

## Account Information

| | |
|---|---|
| Account Number | 7442501532 |
| Current Statement Date | May 11, 2007 |
| Maturity Date | February 01, 2037 |
| Interest Rate | 7.25000 |
| Current Principal Balance* | $748,980.52 |
| Current Escrow Balance | $0.00 |
| Interest Paid Year-to-Date | $3,326.06 |
| Taxes Paid Year-to-Date | $0.00 |

## Details of Amount Due/Paid

| | |
|---|---|
| Principal and Interest | $2,401.20 |
| Subsidy/Buydown | $0.00 |
| Escrow | $0.00 |
| Amount Past Due | $0.00 |
| Outstanding Late Charges | $0.00 |
| Other | $0.00 |
| Total Amount Due | $2,401.20 |
| Account Due Date | June 01, 2007 |

**Additional Payment Options:**
Each of the following payment options will include an Escrow Payment and/or additional products, when applicable.

| | |
|---|---|
| Minimum Payment (You may INCREASE your loan balance): | $2,401.20 |
| Interest Only Payment (You will NOT reduce your loan balance): | $4,525.09 |
| Fully Amortizing Payment (You will reduce your loan balance): | $5,121.42 |
| 15 Year Amortizing Payment (You will reduce your loan balance): | $6,901.47 |

### For questions on the servicing of your account, call 1-800-206-2901.

## Account Activity Since Last Statement

| Description | Due Date | Tran. Date | Tran. Total | Principal | Interest | Escrow | Add'l Products | Late Charge | Other |
|---|---|---|---|---|---|---|---|---|---|
| Payment | 05/01/07 | 05/11/07 | $2,401.20 | $2,111.14- | $4,512.34 | | | | $2,111.14 |

*This is your Principal Balance only, not the amount required to pay the loan in full. For payoff figures and mailing instructions, call the Customer Care number above or you may obtain necessary payoff figures through our automated system (24 hours a day, 7 days a week).
See back for automatic payment sign-up information and other payment options.

## Important News

The options for your next payment are displayed above. If you elect to make the Minimum Payment, the difference between the Minimum Payment and the Interest Only payment, if any, will be added to the principal loan balance and will accrue additional interest. If you would like to make a payment based on a 15-year amortization, please call the Customer Care number displayed above.

### See Reverse Side For Important Information

61

## Home Equity, Refinancing, or Purchasing a New Home - 24 Hours a Day/ 7 Days a Week

If you are considering a new home purchase, home equity financing, or refinancing your existing mortgage, Homecomings Financial is here to help.  We are available 24 hours a day, 7 days a week.  Simply call 1-877-695-3633 or visit www.homecomings.com for fast, convenient service.

**To Apply Online**
www.Homecomings.com

**To Apply by Phone**
1-877-695-3633

## Convenient Payment Options

**Automatic Payment Plan**

*By signing the box on the front of the statement, Homecomings Financial is authorized to withdraw your scheduled payment on your due date from your bank account. Please understand that you must continue to remit monthly payments by check until written confirmation is received.*

Enrolling in Homecomings' Automated Payment Plan is quick and easy.  First, have your bank routing number and bank account number available and then call us at 1-800-206-2901.

- Listen for the prompts to access your mortgage account information
- Enter your mortgage Account Number and Social Security Number
- Follow the prompts.
  You can complete your enrollment , make changes to your existing Automated Payment Plan information or request that an Automated Payment Plan enrollment form be mailed directly to your home.

**Online Payment Services** — Pay your mortgage bills and view your mortgage account statement online! To get started simply register for Account Access at www.homecomings.com, log-in, and follow the enrollment instructions.

**Mortgage Accelerator** — The bi-weekly payment option, available to qualified customers, could save you thousands of dollars on interest payments...call 1-800-206-2901 for more information (there are fees assessed with this program).

**Mail or Express Mail** — When making your mortgage payment, please detach the coupon portion and mail with your check or money order.  Do not send cash.  Do not send post dated checks.  If paying more than the amount due, be sure to instruct us on the coupon how to apply the excess money.  Please write your account number on your check or money order.

**If you do not have your mortgage payment coupon** send to: **Homecomings Financial, Attn: Payment Processing**
**PO Box 79135, Phoenix, AZ 85062-9135**

**For Express Mail Only** send to: **Homecomings Financial, 6716 Grade Lane,**
**Building 9, Suite 910, Louisville, KY 40213-1407**

**Pay by Phone** — For information and the fee to use this quick and convenient service call 1-800-206-2901.  Please have your bank routing number and bank account number available when you call.

## Account Information or Questions — 1-800-206-2901 or www.homecomings.com

Our automated telephone service will help you get fast and confidential answers to questions.  Be sure to have your account number and social security number available for identification. You can call 24 hours a day, 7 days a week.  Representatives are available from 6:00 a.m.-10:00 p.m. CT Monday-Friday, and 9:00 a.m.-1:00 p.m. CT Saturday.

Special Number for the Hearing Impaired: 1-800-395-9228

**Inquiries** — General inquiries/correspondence should be mailed separately from your account payments.

**Supplemental Tax Bills** — If you receive a supplemental or interim bill from the tax collector and would like the bill paid from escrow, promptly forward the bill to the address listed below prior to the delinquent date.

**General Inquiries**
Homecomings Financial
Attn: Customer Care
P.O. Box 205
Waterloo, IA  50704-0205

**Insurance Policies/Bills**
Homecomings Financial
P.O. Box 100585
Florence, SC  29501-0585
1-800-237-6787

**Tax Bills**
Homecomings Financial
Attn: Tax Dept.
P.O. Box 961219
FT. Worth, TX  76161-0219

**Tax Bills in PA**
Homecomings Financial
Attn: Tax Dept.
P.O. Box 961241
Ft. Worth, TX  76161-0241

## Important Information

**Electronic Debit** — When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic funds transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic funds transfer, funds may be withdrawn from your account as soon as the same day your payment is received, and you will not receive your check back from your financial institution.

**Important Notice** — Homecomings Financial may assess a returned check fee consistent with the laws of your state and your mortgage contract on all checks returned unpaid by your financial institution. Additionally, Homecomings Financial may be attempting to collect a debt and any information obtained will be used for that purpose.  Homecomings Financial may charge a fee for processing payoff requests.

**Important Credit Reporting Notification** — We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Your Privacy** — You will receive  a copy of the Homecomings Financial Privacy Notice annually. Should you wish to obtain an additional copy, please write to us at Homecomings Financial, Voice of the Customer, 100 Witmer Rd., Horsham, PA 19044-1467.

**Partial Payments** — Partial payment funds, if not specified, will be posted to outstanding fees, escrow shortages or as a principal reduction in accordance with the terms of your Note.

**Optional Product Information** — Failure to pay a monthly charge for an Optional Product billed under "Add'l Products" will not cause your mortgage account to be in default.  Please call 1-800-206-2901 if you have any questions or to cancel your Optional Product enrollment.



02-1409-951012(307)

6 2.

# EXHIBIT G

G 3

20000591

# Home Loan Statement
## November 2007

Customer Service:  Toll free 1.866.926.8937 Se habla español
TDD: Dial 7-1-1 for relay assistance
www.wamu.com

#BWNCLNN
#3953049282992393#
20073011 B 0-378 1-2
JOHNNY RAY MOORE                    20000591
15 SACHEM DR
SHELTON CT 06484-1756

| | |
|---|---|
| Statement Date: | **November 29, 2007** |
| Activity Since: | **November 19, 2007** |
| Your Loan Number: | **5304282923** |

### Your Property and Loan Information

| | | |
|---|---|---|
| Property Address: | | 15 SACHEM DR |
| | | SHELTON CT 06484 |
| Principal Balance: | $ | 761,838.76 |
| Interest Rate: | | 7.12500% |
| Escrow Balance: | $ | 0.00 |
| Unpaid Interest, Loan to Date: | $ | 12,858.24 |

### Your Next Payment

| | | |
|---|---|---|
| Next Payment Due: | | **December 01, 2007** |
| Required Note Payment: | $ | 2,401.20 |
| Escrow: | $ | 0.00 |
| Current Payment: | $ | 2,401.20 |
| Minimum Payment :* | $ | 2,401.20 |

**Additional Payment Options:**
Each of the following payment options will include an Escrow Payment and/or Late Charges, when applicable.

| | | | |
|---|---|---|---|
| 1. | Minimum Due: | $ | 2,401.20 |
| 2. | Interest Only Payment: | $ | 4,523.42 |
| 3. | Full Principal and Interest Payment: <br> *(based on the remaining scheduled term of your loan)* | $ | 5,170.76 |
| 4. | Full Principal and Interest Payment: <br> *(based on a 15-year term)* | $ | 7,105.35 |

### Important Messages

* To avoid a late charge of $120.06, we must receive at least the Total Minimum Due, and any escrow deposits and/or past-due payments by 12/16/07 during our business hours.  If this date falls on a weekend or holiday, your payment must be received by the next business day.

Paying only the Minimum Payment may cause your outstanding principal balance to increase.  Explanations of your payment options and Recent Account Activity are on the reverse of this statement.

### Did You Know?

For details about your home loan, visit us at www.wamu.com.  Check recent transactions, order copies of your loan documents, view your current principal balance, or use one of the many helpful loan calculators.  If you're a first time user, simply click on "My Home Loan" and follow the prompts to register by selecting a User ID and Password.

### Adjustable Rate Mortgage Information

| | |
|---|---|
| Index Value: | 4.86333 |
| Margin: | 2.25000 |
| For Payment Due: | December 01, 2007 |
| Interest Rate: | 7.12500% |

### Year to Date Account Activity

| | | |
|---|---|---|
| Principal Paid: | $ | 12,858.24- |
| Interest Paid: | $ | 27,265.44 |
| Property Taxes Paid: | $ | 0.00 |
| Insurance Paid: | $ | 0.00 |
| Late Charges Paid to Date: | $ | 480.24 |

Washington Mutual Bank            908-B         FDIC
20000591

7760 0176    J6G        001    07    0    300711        PAGE 1 of 2        COLD056C

64

## Payment Options

**Option 1: Minimum Payment**
This amount pays the smallest amount of interest and, if applicable, principal that you must pay each month. This amount may not be sufficient to pay all of the accrued interest for the previous month or to pay the loan in full over the remaining scheduled term. Negative amortization may result, which means that any unpaid interest will be added to the principal loan balance and will accrue additional interest.

**Option 2: Interest Only Payment**
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment). However, no portion of the payment will be applied to reduce the principal balance of your loan.

**Option 3: Full Principal and Interest Payment**
*(based on the remaining scheduled term of your loan)*
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on the remaining scheduled term under your loan documents.

**Option 4: Full Principal and Interest Payment**
*(based on a 15-year term)*
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on a 15-year term.

The Minimum Payment is the LEAST amount that you must pay. One or more of the other options may not be available each month. If other options are available, the payment amounts for those options will always be equal to or greater than the Minimum Payment. The payment amount shown for each available option, as applicable, also includes an escrow payment, any unpaid late charges, and fees for optional products. If you have established automatic withdrawals, the amount you selected will be drafted rather than the Minimum Payment.

## Have Questions? Need Mailing Addresses?

At Washington Mutual, customer service is our top priority. If you have general questions about your loan, please call our Customer Service Department toll free at 1.866.926.8937; se habla español or write to us at the "Customer Service Inquiries" address noted below. TDD: Dial 7-1-1 for assistance. (Calls received by our Customer Service Department may be monitored for training purposes.)

Please use the addresses below for other payment or correspondence needs.

**Customer Service Inquiries:**
Washington Mutual Bank
PO Box 100576
Florence, SC 29501-0576
Fax: (843) 673-3507

**Payment without a Coupon:**
Washington Mutual
PO Box 78148
Phoenix, AZ 85062-8148

**Real Estate Tax Bills:**
Washington Mutual Bank
c/o First American RE Tax Service
PO Box 961242
Fort Worth, TX 76161-0242

**Overnight Payment:**
Washington Mutual Bank
6716 Grade Lane
Building 9, Suite 910
Louisville, KY 40213

**Collections (Letters Only):**
Washington Mutual Bank
PO Box 44118
Jacksonville, FL 32231-4118
Fax: (800) 246-4601

**Overnight Payoffs:**
Washington Mutual Bank
Attn: Payoff Unit
7255 Baymeadows Way Suite 908
Jacksonville, FL 32256

**Property Insurance:**
Washington Mutual Bank
PO Box 100590
Florence, SC 29501-0590
Fax: (843) 413-2048

**Loss Draft:**
Washington Mutual Bank
PO Box 100565
Florence, SC 29501
Fax: (843) 673-3923

### Notice About Electronic Check Conversion

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive payment, and you will not receive your check back from your financial institution.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

## Recent Account Activity



| Date | Description | Total Amount | Principal | Interest | Escrow | Optional Products | Unapplied Funds/Subsidies | Other Fees/Late Charges |
|------|-------------|--------------|-----------|----------|--------|-------------------|---------------------------|-------------------------|
| 11/29 | Payment | $2,701.38 | $2,109.69- | $4,510.89 | | | | $300.18 |

GS

20007928

Customer Service: Toll free 1.866.926.8937 Se habla español
TDD: Dial 7-1-1 for relay assistance
www.wamu.com

#BWNCLNN
#3953049282992393#
20072012 B 0-14 1-2
JOHNNY RAY MOORE                    20007928
15 SACHEM DR
SHELTON CT 06484-1756

# Home Loan Statement
## December 2007

| | |
|---|---|
| Statement Date: | December 19, 2007 |
| Activity Since: | December 18, 2007 |
| Your Loan Number: | 5304282923 |

## Your Property and Loan Information

| | | |
|---|---|---|
| Property Address: | | 15 SACHEM DR |
| | | SHELTON CT 06484 |
| Principal Balance: | $ | 763,960.98 |
| Interest Rate: | | 7.00000% |
| Escrow Balance: | $ | 0.00 |
| Unpaid Interest, Loan to Date: | $ | 14,980.46 |

## Did You Know?

Federal law determines reportable interest for tax purposes, so the interest shown may not be the reportable amount. Our automated phone system and web site will have year-end information by January 2, 2008 and we will mail this information to you by January 31, 2008. Credit for interest will be given to payments received by December 31, 2007. Please call toll free 866.926.8937 before 6:00pm Pacific Time on December 31, 2007 if you would like to make a Just in Time EFT® payment for a fee prior to the end of the year.

The fixed rate period on your home loan is about to expire. This could result in a change to your interest rate and payment. Please contact a WaMu Home Loan Consultant at 866.608.4797 to discuss your options.

## Your Next Payment

| | | |
|---|---|---|
| Next Payment Due: | | January 01, 2008 |
| Required Note Payment: | $ | 2,401.20 |
| Escrow: | $ | 0.00 |
| Current Payment: | $ | 2,401.20 |
| Plus | | |
| Unpaid Late Charges: | $ | 120.06 |
| Minimum Payment :* | $ | 2,521.26 |

**Additional Payment Options:**
Each of the following payment options will include an Escrow Payment and/or Late Charges, when applicable.

| | | |
|---|---|---|
| 1. Minimum Due: | $ | 2,521.26 |
| 2. Interest Only Payment: | $ | 4,576.50 |
| 3. Full Principal and Interest Payment: | $ | 5,245.85 |
| *(based on the remaining scheduled term of your loan)* | | |
| 4. Full Principal and Interest Payment: | $ | 7,216.62 |
| *(based on a 15-year term)* | | |

## Important Messages

* To avoid a late charge of $120.06, we must receive at least the Total Minimum Due, and any escrow deposits and/or past-due payments by 01/16/08 during our business hours. If this date falls on a weekend or holiday, your payment must be received by the next business day.

Paying only the Minimum Payment may cause your outstanding principal balance to increase. Explanations of your payment options and Recent Account Activity are on the reverse of this statement.

## Adjustable Rate Mortgage Information

| | |
|---|---|
| Index Value: | 4.78750 |
| Margin: | 2.25000 |
| For Payment Due: | January 01, 2008 |
| Interest Rate: | 7.00000% |

## Year to Date Account Activity

| | | |
|---|---|---|
| Principal Paid: | $ | 14,980.46- |
| Interest Paid: | $ | 31,788.86 |
| Property Taxes Paid: | $ | 0.00 |
| Insurance Paid: | $ | 0.00 |
| Late Charges Paid to Date: | $ | 480.24 |

Washington Mutual Bank         908-B

FDIC  

COLD056C
20007928

66

## Payment Options

**Option 1: Minimum Payment**
This amount pays the smallest amount of interest and, if applicable, principal that you must pay each month. This amount may not be sufficient to pay all of the accrued interest for the previous month or to pay the loan in full over the remaining scheduled term. Negative amortization may result, which means that any unpaid interest will be added to the principal loan balance and will accrue additional interest.

**Option 2: Interest Only Payment**
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment). However, no portion of the payment will be applied to reduce the principal balance of your loan.

**Option 3: Full Principal and Interest Payment**
*(based on the remaining scheduled term of your loan)*
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on the remaining scheduled term under your loan documents.

**Option 4: Full Principal and Interest Payment**
*(based on a 15-year term)*
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on a 15-year term.

The Minimum Payment is the LEAST amount that you must pay. One or more of the other options may not be available each month. If other options are available, the payment amounts for those options will always be equal to or greater than the Minimum Payment. The payment amount shown for each available option, as applicable, also includes an escrow payment, any unpaid late charges, and fees for optional products. If you have established automatic withdrawals, the amount you selected will be drafted rather than the Minimum Payment.

## Have Questions? Need Mailing Addresses?

At Washington Mutual, customer service is our top priority. If you have general questions about your loan, please call our Customer Service Department toll free at 1.866.926.8937; se habla español or write to us at the "Customer Service Inquiries" address noted below. TDD: Dial 7-1-1 for assistance. (Calls received by our Customer Service Department may be monitored for training purposes.)

Please use the addresses below for other payment or correspondence needs.

**Customer Service Inquiries:**
Washington Mutual Bank
PO Box 100576
Florence, SC 29501-0576
Fax: (843) 673-3507

**Payment without a Coupon:**
Washington Mutual
PO Box 78148
Phoenix, AZ 85062-8148

**Real Estate Tax Bills:**
Washington Mutual Bank
c/o First American RE Tax Service
PO Box 961242
Fort Worth, TX 76161-0242

**Overnight Payment:**
Washington Mutual Bank
6716 Grade Lane
Building 9, Suite 910
Louisville, KY 40213

**Collections (Letters Only):**
Washington Mutual Bank
PO Box 44118
Jacksonville, FL 32231-4118
Fax: (800) 246-4601

**Overnight Payoffs:**
Washington Mutual Bank
Attn: Payoff Unit
7255 Baymeadows Way Suite 908
Jacksonville, FL 32256

**Property Insurance:**
Washington Mutual Bank
PO Box 100590
Florence, SC 29501-0590
Fax: (843) 413-2048

**Loss Draft:**
Washington Mutual Bank
PO Box 100565
Florence, SC 29501
Fax: (843) 673-3923

### Notice About Electronic Check Conversion

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive payment, and you will not receive your check back from your financial institution.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

## Recent Account Activity

| Date | Description | Total Amount | Principal | Interest | Escrow | Optional Products | Unapplied Funds/Subsidies | Other Fees/ Late Charges |
|------|-------------|--------------|-----------|----------|--------|-------------------|---------------------------|--------------------------|
| 12/19 | Payment | $2,401.20 | $2,122.22- | $4,523.42 | | | | |

*(handwritten notes)*
1107.72
2451.20
———
3558.92

1107.72
2401.

67

20001958

0-1
1-2

Customer Service: Toll free 1.866.926.8937 Se habla español
TDD: Dial 7-1-1 for relay assistance
www.wamu.com

#BWNCLNN
#3953049282992393#
20081710 B 0-1 1-2
JOHNNY RAY MOORE                          20001958
15 SACHEM DR
SHELTON CT 06484-1756

# Home Loan Statement
## October 2008

| | |
|---|---|
| Statement Date: | October 16, 2008 |
| Activity Since: | September 16, 2008 |
| Your Loan Number: | 5304282923 |

## Your Property and Loan Information

| | | |
|---|---|---|
| Property Address: | | 15 SACHEM DR |
| | | SHELTON CT 06484 |
| Principal Balance: | $ | 777,945.68 |
| Interest Rate: | | 4.87500% |
| Escrow Balance: | $ | 0.00 |
| Unpaid Interest, Loan to Date: | $ | 31,395.68 |

## Your Next Payment

| | | |
|---|---|---|
| Next Payment Due: | | November 01, 2008 |
| Required Note Payment: | $ | 2,581.29 |
| Escrow: | $ | 0.00 |
| Current Payment: | $ | 2,581.29 |
| Plus | | |
| Unpaid Late Charges: | $ | 239.24 |
| Minimum Payment :* | $ | 2,820.53 |

**Additional Payment Options:**
Each of the following payment options will include an Escrow Payment and/or Late Charges, when applicable.

| | | |
|---|---|---|
| 1. Minimum Due: | $ | 2,820.53 |
| 2. Interest Only Payment: | $ | 3,399.64 |
| 3. Full Principal and Interest Payment: | $ | 4,464.20 |
| *(based on the remaining scheduled term of your loan)* | | |
| 4. Full Principal and Interest Payment: | $ | 6,861.13 |
| *(based on a 15-year term)* | | |

## Important Messages

* To avoid a late charge of $129.06, we must receive at least the Total Minimum Due, and any escrow deposits and/or past-due payments by 11/16/08 during our business hours.  If this date falls on a weekend or holiday, your payment must be received by the next business day.

Paying only the Minimum Payment may cause your outstanding principal balance to increase.  Explanations of your payment options and Recent Account Activity are on the reverse of this statement.

## Did You Know?

For details about your home loan, visit us at www.wamu.com.  Check recent transactions, order copies of your loan documents, view your current principal balance, or use one of the many helpful loan calculators.  If you're a first time user, simply click on "My Home Loan" and follow the prompts to register by selecting a User ID and Password.

## Adjustable Rate Mortgage Information

| | |
|---|---|
| Index Value: | 2.66416 |
| Margin: | 2.25000 |
| For Payment Due: | November 01, 2008 |
| Interest Rate: | 4.87500% |

## Year to Date Account Activity

| | | |
|---|---|---|
| Principal Paid: | $ | 13,984.70- |
| Interest Paid: | $ | 39,437.42 |
| Property Taxes Paid: | $ | 0.00 |
| Insurance Paid: | $ | 0.00 |
| Late Charges Paid to Date: | $ | 250.00 |

Washington Mutual Bank          908-B           FDIC

68

## Payment Options

**Option 1: Minimum Payment**
This amount pays the smallest amount of interest and, if applicable, principal that you must pay each month. This amount may not be sufficient to pay all of the accrued interest for the previous month or to pay the loan in full over the remaining scheduled term. Negative amortization may result, which means that any unpaid interest will be added to the principal loan balance and will accrue additional interest.

**Option 2: Interest Only Payment**
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment). However, no portion of the payment will be applied to reduce the principal balance of your loan.

**Option 3: Full Principal and Interest Payment**
*(based on the remaining scheduled term of your loan)*
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on the remaining scheduled term under your loan documents.

**Option 4: Full Principal and Interest Payment**
*(based on a 15-year term)*
This amount pays all of the accrued interest for the previous month (including the amount that exceeds the Minimum Payment) and a sufficient amount of principal to pay off your loan based on a 15-year term.

The Minimum Payment is the LEAST amount that you must pay. One or more of the other options may not be available each month. If other options are available, the payment amounts for those options will always be equal to or greater than the Minimum Payment. The payment amount shown for each available option, as applicable, also includes an escrow payment, any unpaid late charges, and fees for optional products. If you have established automatic withdrawals, the amount you selected will be drafted rather than the Minimum Payment.

## Have Questions? Need Mailing Addresses?

At Washington Mutual, customer service is our top priority. If you have general questions about your loan, please call our Customer Service Department toll free at 1.866.926.8937; se habla español or write to us at the "Customer Service Inquiries" address noted below. TDD: Dial 7-1-1 for assistance. (Calls received by our Customer Service Department may be monitored for training purposes.)

Please use the addresses below for other payment or correspondence needs.

**Customer Service Inquiries:**
Washington Mutual Bank
PO Box 100576
Florence, SC 29502-0576
Fax: (843) 673-3507

**Payment without a Coupon:**
Washington Mutual
PO Box 78148
Phoenix, AZ 85062-8148

**Real Estate Tax Bills:**
Washington Mutual Bank
c/o First American RE Tax Service
1 First American Way
Westlake, TX 76262

**Overnight Payment:**
Washington Mutual Bank
6716 Grade Lane
Building 9, Suite 910
Louisville, KY 40213

**Collections (Letters Only):**
Washington Mutual Bank
PO Box 44118
Jacksonville, FL 32231-4118
Fax: (800) 246-4601

**Overnight Payoffs:**
Washington Mutual Bank
Attn: Payoff Unit
7255 Baymeadows Way Suite 908
Jacksonville, FL 32256

**Property Insurance:**
Washington Mutual Bank
PO Box 100590
Florence, SC 29502-0590
Fax: (843) 413-2048

**Loss Draft:**
Washington Mutual Bank
PO Box 100565
Florence, SC 29502
Fax: (843) 673-3923

### Notice About Electronic Check Conversion

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive payment, and you will not receive your check back from your financial institution.

*We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

## Recent Account Activity

| Date | Description | Total Amount | Principal | Interest | Escrow | Optional Products | Unapplied Funds/Subsidies | Other Fees/ Late Charges |
|------|-------------|-------------|-----------|----------|--------|-------------------|---------------------------|--------------------------|
| 10/16 | Payment | $2,581.29 | $738.03- | $3,319.32 | | | | |

69

EXHIBIT _H_

Page 1 of 2

**WaMu**

Washington Mutual
Customer Service: Toll free 1.866.926.8937 Se habla español
TDD: Dial 7-1-1 for relay assistance
www.wamu.com

**PROPERTY ADDRESS:**
15 SACHEM DR
SHELTON CT 06484

**Loan Number:**          5304282923
**Statement Date:**          03/20/2009

#BWNCLNN
#3953049282992393#
20092303 8 0
JOHNNY RAY MOORE                    20000894
15 SACHEM DR
SHELTON CT 06484-1756

Below is a record, IRS Form 1098, of the interest and real estate tax activity on your home loan during the 2008 tax year. It should be retained for tax reporting purposes. The back of the form contains "Instructions for Payer/Borrower," which may help you determine which portion of the interest payments may be deductible; however, you may also want to consult with a financial advisor.

The total amount of home loan interest payments received from you is listed in Box 1. This amount was determined based on the following calculations:

### 2008 Interest Calculations:
| | |
|---|---|
| Total Interest Received in 2008: | $45,679.48 |
| LESS: Deferred Interest Assessed: | $15,064.18 |
| PLUS: Late Charges Paid: | $250.00 |
| **Total Mortgage Interest Received from Payer(s) / Borrower(s):** | **$30,865.30** |

Box 2 contains information on any upfront points you may have paid, and Box 3 indicates any refund of overpaid interest that you may have received. Box 4 indicates mortgage insurance premiums paid. Finally, Box 5 indicates the dollar amount of real estate taxes paid on your behalf by Washington Mutual during the 2008 tax year.

7760 0409    J6G    001    0    230903    PAGE 1 of 2    COLD056C                    20000894

☐ CORRECTED (if checked)

| RECIPIENT'S/LENDER'S name, address, and telephone number | * **Caution:** The amount shown may not be fully deductible by you. Limits based on the loan amount and the cost and value of the secured property may apply. Also, you may only deduct interest to the extent it was incurred by you, actually paid by you, and not reimbursed by another person. | OMB No. 1545-0901 **2008** Substitute Form **1098** | **Mortgage Interest Statement** |
|---|---|---|---|
| JPMorgan Chase Bank, N.A., formerly WaMu (Home Loans) P.O. Box 100576 Florence, SC 29502-0576 (866) 926-8937 | | | |

| RECIPIENT'S federal identification no. | PAYER'S social security number | 1 Mortgage interest received from payer(s)/borrower(s)* | **Copy B For Payer** |
|---|---|---|---|
| 13-4994650 | 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 | $30,865.30 | The information in boxes 1, 2, 3, and 4 is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if the IRS determines that an underpayment of tax results because you overstated a deduction for this mortgage interest or for these points or because you did not report this refund of interest on your return. |
| PAYER'S/BORROWER'S name JOHNNY RAY MOORE | | 2 Points paid on purchase of principal residence $0.00 | |
| Street address (including apt. no.) 15 SACHEM DR | | 3 Refund of overpaid interest $0.00 | |
| City, state, and ZIP code SHELTON CT 06484-1756 | | 4 Mortgage insurance premiums $0.00 | |
| Account number (see instructions) 5304282923 | | 5 Real estate taxes $0.00 | |

Form **1098**          (keep for your records)          Department of the Treasury - Internal Revenue Service

WaMu

## Instructions for Payer/Borrower

A person (including a financial institution, a governmental unit, and a cooperative housing corporation) who is engaged in a trade or business and, in the course of such trade or business, received from you at least $600 of mortgage interest (including certain points) on any one mortgage in the calendar year must furnish this statement to you.

If you received this statement as the payer of record on a mortgage on which there are other borrowers, furnish each of the other borrowers with information about the proper distribution of amounts reported on this form. Each borrower is entitled to deduct only the amount he or she paid and points paid by the seller that represent his or her share of the amount allowable as a deduction. Each borrower may have to include in income a share of any amount reported in box 3.

If your mortgage payments were subsidized by a government agency, you may not be able to deduct the amount of the subsidy. See the instructions for Form 1040, Schedule A, C, or E for how to report the mortgage interest. Also, for more information, see Pub. 936, Home Mortgage Interest Deduction, and Pub. 535, Business Expenses.

**Account number.** May show an account or other unique number the lender has assigned to distinguish your account.

**Box 1.** Shows the mortgage interest received during the year. This amount includes interest on any obligation secured by real property, including a home equity, line of credit, or credit card loan. This amount does not include points, government subsidy payments, or seller payments on a "buy-down" mortgage. Such amounts are deductible by you only in certain circumstances. **Caution:** *If you prepaid interest in*

*2008 that accrued in full by January 15, 2009, this prepaid interest may be included in box 1. However, you cannot deduct the prepaid amount in 2008 even though it may be included in box 1.* If you hold a mortgage credit certificate and can claim the mortgage interest credit, see Form 8396, Mortgage Interest Credit. If the interest was paid on a mortgage, home equity, line of credit, or credit card loan secured by your personal residence, you may be subject to a deduction limitation.

**Box 2.** Not all points are reportable to you. Box 2 shows points you or the seller paid this year for the purchase of your principal residence that are required to be reported to you. Generally, these points are fully deductible in the year paid, but you must subtract seller-paid points from the basis of your residence. Other points not reported in box 2 may also be deductible. See Pub. 936 to figure the amount you can deduct.

**Box 3. Do not deduct this amount.** It is a refund (or credit) for overpayment(s) of interest you made in a prior year or years. If you itemized deductions in the year(s) you paid the interest, you may have to include part or all of the box 3 amount on the "Other income" line of your 2008 Form 1040. No adjustment to your prior year(s) tax return(s) is necessary. For more information, see Pub. 936 and *Itemized Deduction Recoveries* in Pub. 525, Taxable and Nontaxable Income.

**Box 4.** Shows mortgage insurance premiums which may qualify to be treated as deductible mortgage interest. See the Schedule A (Form 1040) instructions.

**Box 5.** The interest recipient may use this box to give you other information, such as the address of the property that secures the debt, real estate taxes, or insurance paid from escrow.

72

# EXHIBIT I

73

# PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

### AMONG

### FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF WASHINGTON MUTUAL BANK, HENDERSON, NEVADA

### FEDERAL DEPOSIT INSURANCE CORPORATION

**and**

### JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

### DATED AS OF

### SEPTEMBER 25, 2008

74

# TABLE OF CONTENTS

**ARTICLE I**     **DEFINITIONS** ...................................................................................2

**ARTICLE II**    **ASSUMPTION OF LIABILITIES** ..............................................8

|       |                                           |     |
|-------|-------------------------------------------|-----|
| 2.1   | Liabilities Assumed by Assuming Bank ...... | 8   |
| 2.2   | Interest on Deposit Liabilities .......... | 8   |
| 2.3   | Unclaimed Deposits ....................... | 8   |
| 2.4   | Omitted .................................. | 9   |
| 2.5   | Borrower Claims .......................... | 9   |

**ARTICLE III**   **PURCHASE OF ASSETS** ..............................................................9

|       |                                                          |     |
|-------|----------------------------------------------------------|-----|
| 3.1   | Assets Purchased by Assuming Bank ...................... | 9   |
| 3.2   | Asset Purchase Price ................................... | 9   |
| 3.3   | Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. | 10 |
| 3.4   | Puts of Assets to the Receiver ......................... | 10  |
| 3.5   | Assets Not Purchased by Assuming Bank .................. | 11  |
| 3.6   | Assets Essential to Receiver ........................... | 11  |

**ARTICLE IV**    **ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS**........13

|       |                                                              |     |
|-------|--------------------------------------------------------------|-----|
| 4.1   | Continuation of Banking Business ........................... | 13  |
| 4.2   | Agreement with Respect to Credit Card Business ............. | 13  |
| 4.3   | Agreement with Respect to Safe Deposit Business ............ | 13  |
| 4.4   | Agreement with Respect to Safekeeping Business ............. | 13  |
| 4.5   | Agreement with Respect to Trust Business .................. | 13  |
| 4.6   | Agreement with Respect to Bank Premises ................... | 14  |
| 4.7   | Agreement with Respect to Leased Data Processing Equipment | 16 |
| 4.8   | Agreement with Respect to Certain Existing Agreements ...... | 16  |
| 4.9   | Informational Tax Reporting ............................... | 17  |
| 4.10  | Insurance ................................................. | 17  |
| 4.11  | Office Space for Receiver and Corporation ................. | 17  |
| 4.12  | Omitted ................................................... | 18  |
| 4.13  | Omitted ................................................... | 18  |

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

75