| | | |
|---|---|---|
| **ARTICLE V** | **DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK** | **18** |
| 5.1 | Payment of Checks, Drafts and Orders | 18 |
| 5.2 | Certain Agreements Related to Deposits | 18 |
| 5.3 | Notice to Depositors | 18 |
| **ARTICLE VI** | **RECORDS** | **19** |
| 6.1 | Transfer of Records | 19 |
| 6.2 | Delivery of Assigned Records | 20 |
| 6.3 | Preservation of Records | 20 |
| 6.4 | Access to Records; Copies | 20 |
| **ARTICLE VII** | **BID; INITIAL PAYMENT** | **20** |
| **ARTICLE VIII** | **PROFORMA** | **20** |
| **ARTICLE IX** | **CONTINUING COOPERATION** | **21** |
| 9.1 | General Matters | 21 |
| 9.2 | Additional Title Documents | 21 |
| 9.3 | Claims and Suits | 21 |
| 9.4 | Payment of Deposits | 22 |
| 9.5 | Withheld Payments | 22 |
| 9.6 | Proceedings with Respect to Certain Assets and Liabilities | 22 |
| 9.7 | Information | 23 |
| **ARTICLE X** | **CONDITION PRECEDENT** | **23** |
| **ARTICLE XI** | **REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK** | **23** |
| **ARTICLE XII** | **INDEMNIFICATION** | **24** |
| 12.1 | Indemnification of Indemnitees | 25 |
| 12.2 | Conditions Precedent to Indemnification | 27 |
| 12.3 | No Additional Warranty | 28 |
| 12.4 | Indemnification of Corporation and Receiver | 29 |
| 12.5 | Obligations Supplemental | 29 |
| 12.6 | Criminal Claims | 29 |
| 12.7 | Limited Guaranty of the Corporation | 29 |
| 12.8 | Subrogation | 30 |

iii

76

**ARTICLE XIII**     **MISCELLANEOUS** ..................................................................30

    13.1    Entire Agreement ...............................................................30
    13.2    Headings ............................................................................30
    13.3    Counterparts.......................................................................30
    13.4    Governing Law ..................................................................30
    13.5    Successors ..........................................................................30
    13.6    Modification; Assignment .................................................31
    13.7    Notice .................................................................................31
    13.8    Manner of Payment............................................................31
    13.9    Costs, Fees and Expenses ..................................................32
    13.10   Waiver.................................................................................32
    13.11   Severability ........................................................................32
    13.12   Term of Agreement.............................................................32
    13.13   Survival of Covenants, Etc. ...............................................32

**SCHEDULES**

    2.1    Certain Liabilities Not Assumed.........................................34
    3.2    Purchase Price of Assets or Assets .....................................35
    3.5    Certain Assets Not Purchased.............................................37

**EXHIBIT**

    3.2(c)    Valuation of Certain Qualified Financial Contracts ...................................38

iv

77

## PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

**THIS AGREEMENT**, made and entered into as of the 25th day of September, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of WASHINGTON MUTUAL BANK, HENDERSON, NEVADA** (the "Receiver"), **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, organized under the laws of the United States of America, and having its principal place of business in Seattle, Washington (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

### WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed Washington Mutual Bank (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, the Assuming Bank desires to purchase substantially all of the assets and assume all deposit and substantially all other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

78

# ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" means Subsidiaries of the Failed Bank acquired pursuant to Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Agreement**" means this Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

"**Assumed Deposits**" means Deposits.

"**Bank Closing**" means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

"**Bank Premises**" means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

"**Bid Amount**" has the meaning provided in Article VII.

2

79

"**Book Value**" means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Assuming Bank for normal operational and timing differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. The Book Value of a Subsidiary of the Failed Bank acquired by the Assuming Bank shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

"**Business Day**" means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

"**Chartering Authority**" means (i) with respect to a national bank, the Office of the Comptroller of the Currency, (ii) with respect to a Federal savings association or savings bank, the Office of Thrift Supervision, (iii) with respect to a bank or savings institution chartered by a State, the agency of such State charged with primary responsibility for regulating and/or closing banks or savings institutions, as the case may be, (iv) the Corporation in accordance with 12 U.S.C. Section 1821(c), with regard to self appointment, or (v) the appropriate Federal banking agency in accordance with 12 U.S.C. 1821(c)(9).

"**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

3

Washington Mutual Bank
Henderson, Nevada

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

"**Furniture and Equipment**" means the furniture and equipment (other than leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, and artwork.

"**Indemnitees**" means, except as provided in paragraph (11) of Section 12.1(b), (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

4

"**Initial Payment**" means the payment made pursuant to Article VII, the amount of which shall be either (i) if the Bid Amount is positive, the Bid Amount plus the Required Payment or (ii) if the Bid Amount is negative, the Required Payment minus the Bid Amount. The Initial Payment shall be payable by the Corporation to the Assuming Bank if the Initial Payment is a negative amount. The Initial Payment shall be payable by the Assuming Bank to the Corporation if the Initial Payment is positive.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

"**Liabilities Assumed**" has the meaning provided in Section 2.1.

"**Lien**" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

"**Loans**" means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i)    loans (including loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to Bank Closing), participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii)    all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii)    all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of "Loans" amounts owing under Qualified Financial Contracts.

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

5



**"Other Real Estate"** means all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by the Failed Bank.

**"Payment Date"** means the first Business Day after Bank Closing.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

**"Primary Indemnitor"** means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

**"Proforma"** means producing a balance sheet that reflects a reasonably accurate financial statement of the Failed Bank through the date of closing. The Proforma financial statements serve as a basis for the opening entries of both the Assuming Bank and the Receiver.

**"Put Date"** has the meaning provided in Section 3.4.

**"Put Notice"** has the meaning provided in Section 3.4.

**"Qualified Financial Contract"** means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

**"Record"** means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

**"Related Liability"** with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

**"Related Liability Amount"** with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with

6

respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Required Payment**" means $50,000,000.00.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a)  (i) in the event of a negative Bid Amount, the amount paid by the Assuming Bank, discounted by a percentage equal to the quotient produced by dividing the Assuming Bank's Bid Amount by the aggregate Book Value of the Risk Assets of the Failed Bank;

(ii) in the event of a negative Bid Amount, the amount resulting from (a)(i), above, or in the event of a positive Bid Amount, the amount paid by the Assuming Bank, (x) for a Loan, shall be decreased by any portion of the Loan classified "loss" and by one-half of any portion of the Loan classified "doubtful" as of the date of Bank Closing, and (y) for any Asset or asset, including a Loan, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b)  the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable and the Bid Amount shall be considered to have been positive for Loans repurchased pursuant to Section 3.4(a).

"**Risk Assets**" means (i) all Loans purchased hereunder, excluding (a) New Loans and (b) Loans to the extent secured by Assumed Deposits (and not included in (i)(a)), plus (ii) the Accrued Interest Receivable, Prepaid Expense, and Other Assets.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as

7

84

may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

2.1    **Liabilities Assumed by Assuming Bank.** Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

2.2    **Interest on Deposit Liabilities.** The Assuming Bank agrees that it will assume all deposit contracts as of Bank Closing, and it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at the same rate(s) and on the same terms as agreed to by the Failed Bank as existed as of Bank Closing. If such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.

2.3    **Unclaimed Deposits.** If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation an electronic schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the

8

85

Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

**2.4    Omitted.**

**2.5    Borrower Claims.** Notwithstanding anything to the contrary in this Agreement, any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities are specifically not assumed by the Assuming Bank.

## ARTICLE III
## PURCHASE OF ASSETS

**3.1    Assets Purchased by Assuming Bank.** Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a. Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

**3.2    Asset Purchase Price.**

(a)    All Assets and assets of the Failed Bank subject to an option to purchase by the Assuming Bank shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on Schedule 3.2, except as otherwise may be provided herein. Any Asset, asset of the Failed Bank subject to an option to purchase or other asset purchased for which no purchase price is specified on Schedule 3.2 or otherwise herein shall be purchased at its Book Value. Loans or other assets charged off the Accounting Records of the Failed Bank prior to the date of Bank Closing shall be purchased at a price of zero.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada



(b)     The purchase price for securities (other than the capital stock of any Acquired Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable), market price for each such security quoted at the close of the trading day effective on Bank Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is not available for any such security, the Assuming Bank will submit a bid for each such security within three days of notification/bid request by the Receiver (unless a different time period is agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed to be an excluded asset hereunder.

(c)     Qualified Financial Contracts shall be purchased at market value determined in accordance with the terms of Exhibit 3.2(c). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank.

**3.3     Manner of Conveyance; Limited Warranty; Nonrecourse; Etc**. THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

**3.4     Puts of Assets to the Receiver**.

(a)     **Omitted**.

(b)     **Puts Prior to the Settlement Date**. During the period from Bank Closing to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset which the Assuming Bank can establish is evidenced by forged or stolen instruments as of Bank Closing. The Assuming Bank shall transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset, as provided in Section 12.4.

(c)     **Notices to the Receiver**. In the event that the Assuming Bank elects to require the Receiver to purchase one or more Assets, the Assuming Bank shall deliver to the Receiver a notice (a "Put Notice") which shall include:

(i)     a list of all Assets that the Assuming Bank requires the Receiver to purchase;

10

    (ii)    a list of all Related Liabilities with respect to the Assets identified pursuant to (i) above; and

    (iii)    a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

    (d)    **Purchase by Receiver**. The Receiver shall purchase Loans that are specified in the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of such Loans and Related Liabilities shall be effective as of a date determined by the Receiver which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files with respect to such Loans (the "Put Date").

    (e)    **Purchase Price and Payment Date**. Each Loan purchased by the Receiver pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such Loan less the Related Liability Amount applicable to such Loan, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of such difference; if the difference between such amounts is negative, then the Assuming Bank shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.4(e) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

    (f)    **Servicing**. The Assuming Bank shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

    (g)    **Reversals**. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.4.

    **3.5**    **Assets Not Purchased by Assuming Bank**. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement the assets or Assets listed on the attached Schedule 3.5.

    **3.6**    **Assets Essential to Receiver**.

11

(a)      The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right, title and interest in and to, any Asset or asset essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the Receiver determines to be:

(i)      made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

(ii)     the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii)    made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv)     secured by collateral which also secures any asset owned by the Receiver; or

(v)      related to any asset of the Failed Bank not purchased by the Assuming Bank under this Article III or any liability of the Failed Bank not assumed by the Assuming Bank under Article II.

(b)      Each such Asset or asset purchased by the Receiver shall be purchased at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset, in each case determined as of the date of the notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay the Assuming Bank not later than the twentieth (20th) Business Day following receipt of related Credit Documents and Credit Files together with interest on such amount at the Settlement Interest Rate for the period from and including the date of receipt of such documents to and including the day preceding the day on which payment is made. The Assuming Bank agrees to administer and manage each such Asset or asset in accordance with usual and prudent banking standards and business practices until each such Asset or asset is purchased by the Receiver. All transfers with respect to Asset or assets under this Section 3.6 shall be made as provided in Section 9.6. The Assuming Bank shall transfer all such Asset or assets and Related Liabilities to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset or asset, as provided in Section 12.4.

**ARTICLE IV**

12

## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank agrees with the Receiver and the Corporation as follows:

**4.1** <u>**Continuation of Banking Business**</u>. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking business day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

**4.2** <u>**Agreement with Respect to Debit and Credit Card Business**</u>. The Assuming Bank agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's debit and credit card business, and/or processing related to debit and credit cards, if any, and assumes all outstanding extensions of credit with respect thereto.

**4.3** <u>**Agreement with Respect to Safe Deposit Business**</u>. The Assuming Bank assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; <u>provided, that</u> the Assuming Bank may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Bank located in the trade area of the Failed Bank. Fees related to the safe deposit business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.4** <u>**Agreement with Respect to Safekeeping Business**</u>. The Receiver transfers, conveys and delivers to the Assuming Bank and the Assuming Bank accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Bank shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; <u>provided, that</u>, fees related to the safe keeping business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank. The Assuming Bank shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing.

**4.5** <u>**Agreement with Respect to Trust Business**</u>.

(a)     The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank

13

90

Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder.

(b)    The Assuming Bank shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c)    In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Bank agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Bank in accomplishing such transfer.

(d)    The Assuming Bank shall provide to the Receiver written verification of the assets held in connection with the Failed Bank's trust business within sixty (60) days after Bank Closing.

### 4.6    Agreement with Respect to Bank Premises.

(a)    **Option to Lease.** The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all leases for leased Bank Premises, if any, which have been continuously occupied by the Assuming Bank from Bank Closing to the date it elects to accept an assignment of the leases with respect thereto to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease. If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Bank containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property. The Assuming Bank shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof). The Assuming Bank agrees to assume all leases assigned (or enter into subleases in lieu thereof) pursuant to this Section 4.6.

(b)    **Facilitation.** The Receiver agrees to facilitate the assumption, assignment or sublease of leases or the negotiation of new leases by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(c)    **Occupancy.** The Assuming Bank shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Bank has not exercised the option provided in Section 4.6(a). Any such notice shall be deemed to terminate the Assuming Bank's option with respect to such leased Bank Premises.

14

Washington Mutual Bank
Henderson, Nevada

91

(d)   **Occupancy Costs.**

(i)   The Assuming Bank agrees, during the period of any occupancy by it of leased Bank Premises, to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(ii)   The Assuming Bank agrees during the period of occupancy by it of leased Bank Premises to pay to the Receiver rent for the use of all leased Furniture and Equipment and all owned or leased Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property. If the Assuming Bank purchases any owned Fixtures in accordance with Section 4.6(f), the amount of any rents paid by the Assuming Bank with respect thereto shall be applied as an offset against the purchase price thereof.

(e)   **Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Bank accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises, or if the Assuming Bank does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise), other than in accordance with Section 4.6(a), the Assuming Bank shall (i) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (ii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; provided, that the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (i) or (ii).

(f)   **Vacating Premises.** If the Assuming Bank elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6(a) shall specify the date upon which the Assuming Bank's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred eighty (180) days after Bank Closing. Upon vacating such premises, the Assuming Bank shall relinquish and release to the Receiver such premises and the Fixtures located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(a), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph, the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the

15

Receiver previously repudiated any such lease), and (y) be required to purchase all Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.

(g)    **Omitted.**

**4.7    Agreement with Respect to Leased Data Processing Equipment**

(a)    The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to accept an assignment from the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases can be assigned.

(b)    The Assuming Bank shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept an assignment or sublease of any or all Data Processing Leases and promptly accept an assignment or sublease of such Data Processing Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignment or sublease of any such Data Processing Leases.

(c)    The Receiver agrees to facilitate the assignment or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation.

(d)    The Assuming Bank agrees, during its period of use of any property subject to a Data Processing Lease, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of the applicable Data Processing Leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(e)    The Assuming Bank shall, not later than fifty (50) days after giving the notice provided in Section 4.7(b), (i) relinquish and release to the Receiver all property subject to the relevant Data Processing Lease, in the same condition as at Bank Closing, normal wear and tear excepted, or (ii) accept an assignment or a sublease thereof or negotiate a new lease or license agreement under this Section 4.7.

**4.8    Agreement with Respect to Certain Existing Agreements.**

With respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank, within one hundred twenty (120) days after Bank Closing, the Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, the Assuming Bank agrees to comply with the terms of each such agreement for a period commencing on the day after Bank Closing and ending on: (i) in the case of an agreement that provides for the rendering of services by the Failed Bank, the date which is ninety (90) days after Bank Closing, and (ii) in the case of an agreement that provides for the rendering of services to

16

the Failed Bank, the date which is thirty (30) days after the Assuming Bank has given notice to the Receiver of its election not to assume such agreement; provided, that the Receiver can reasonably make such service agreements available to the Assuming Bank. The Assuming Bank shall be deemed by the Receiver to have assumed agreements for which no notification is timely given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming Bank all right, title and interest of the Receiver, if any, in and to agreements the Assuming Bank assumes hereunder. In the event the Assuming Bank elects not to accept an assignment of any lease (or sublease) or negotiate a new lease for leased Bank Premises under Section 4.6 and does not otherwise occupy such premises, the provisions of this Section 4.8 shall not apply to service agreements related to such premises. The Assuming Bank agrees, during the period it has the use or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of such agreement.  This paragraph shall not apply with respect to deposit contracts which are expressly assumed by the Assuming Bank under Section 2.2 of this Agreement.

**4.9    Informational Tax Reporting**. The Assuming Bank agrees to perform all obligations of the Failed Bank with respect to Federal and State income tax informational reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to Bank Closing, (iii) miscellaneous payments made to vendors of the Failed Bank, and (iv) any other asset or liability of the Failed Bank, including, without limitation, loans not purchased and Deposits not assumed by the Assuming Bank, as may be required by the Receiver.

Under a private letter ruling (PLR) issued to the FDIC in January of 1988, the Internal Revenue Service will allow the Assuming Bank to report for the Failed Bank transactions under its own TIN for the entire year 2008; there is no need to dual-report for different payors in pre- v. post-closing date periods.

The Assuming Bank agrees to prepare on behalf of the Receiver all required Federal and State compliance and income/franchise tax returns for the Failed Bank and acquired subsidiary entities as of Bank Closing. The returns will be provided to the Receiver within the statutorily required filing timeframe.

**4.10    Insurance**. The Assuming Bank agrees to obtain insurance coverage effective from and after Bank Closing, including public liability, fire and extended coverage insurance acceptable to the Receiver with respect to leased Bank Premises that it occupies, and all leased Furniture and Equipment and Fixtures and leased data processing equipment (including hardware and software) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Assuming Bank as the insured as of Bank Closing. All such insurance shall, where appropriate (as determined by the Receiver), name the Receiver as an additional insured.

**4.11    Office Space for Receiver and Corporation**. For the period commencing on the day following Bank Closing and ending on the one hundred eightieth (180th) day thereafter, the Assuming Bank agrees to provide to the Receiver and the Corporation, without charge, adequate

and suitable office space (including parking facilities and vault space), furniture, equipment (including photocopying and telecopying machines) and utilities (including local telephone service and a dedicated broadband or T-1 internet service) at the Bank Premises occupied by the Assuming Bank for their use in the discharge of their respective functions with respect to the Failed Bank. In the event the Receiver and the Corporation determine that the space provided is inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarters having adequate and suitable space and the costs of relocation and any rental and utility costs for the balance of the period of occupancy by the Receiver and the Corporation shall be borne by the Assuming Bank.

    **4.12**    <u>Omitted</u>.

    **4.13**    <u>Omitted</u>.

## ARTICLE V
## DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK

    **5.1**    <u>Payment of Checks, Drafts and Orders</u>. Subject to Section 9.5, the Assuming Bank agrees to pay all properly drawn checks, drafts and withdrawal orders of depositors of the Failed Bank presented for payment, whether drawn on the check or draft forms provided by the Failed Bank or by the Assuming Bank, to the extent that the Deposit balances to the credit of the respective makers or drawers assumed by the Assuming Bank under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Deposit balances due and owing to the depositors of the Failed Bank assumed by the Assuming Bank under this Agreement.

    **5.2**    <u>Certain Agreements Related to Deposits</u>. Subject to Section 2.2, the Assuming Bank agrees to honor the terms and conditions of any written escrow or mortgage servicing agreement or other similar agreement relating to a Deposit liability assumed by the Assuming Bank pursuant to this Agreement.

    **5.3**    <u>Notice to Depositors</u>.

    (a)    Within thirty (30) days after Bank Closing, the Assuming Bank shall give (i) notice to depositors of the Failed Bank of its assumption of the Deposit liabilities of the Failed Bank, and (ii) any notice required under Section 2.2, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the Failed Bank was located. The Assuming Bank agrees that it will obtain prior approval of all such notices and advertisements from counsel for the Receiver and that such notices and advertisements shall not be mailed or published until such approval is received.

    (b)    The Assuming Bank shall give notice by mail to depositors of the Failed Bank concerning the procedures to claim their deposits, which notice shall be provided to the

18

Assuming Bank by the Receiver or the Corporation. Such notice shall be included with the notice to depositors to be mailed by the Assuming Bank pursuant to Section 5.3(a).

(c)    If the Assuming Bank proposes to charge fees different from those charged by the Failed Bank before it establishes new deposit account relationships with the depositors of the Failed Bank, the Assuming Bank shall give notice by mail of such changed fees to such depositors.

## ARTICLE VI
## RECORDS

**6.1    Transfer of Records.**

(a)    In accordance with Section 3.1, the Receiver assigns, transfers, conveys and delivers to the Assuming Bank the following Records pertaining to the Deposit liabilities of the Failed Bank assumed by the Assuming Bank under this Agreement, except as provided in Section 6.4:

(i)    signature cards, orders, contracts between the Failed Bank and its depositors and Records of similar character;

(ii)    passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

(iii)    records of deposit balances carried with other banks, bankers or trust companies;

(iv)    Loan and collateral records and Credit Files and other documents;

(v)    deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(vi)    signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

(vii)    records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)    The Receiver, at its option, may assign and transfer to the Assuming Bank by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Bank as provided in this Agreement, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

96

**6.2    Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

**6.3    Preservation of Records**. The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

**6.4    Access to Records; Copies**. The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Receiver or the Corporation, any Record in the form of microfilm or microfiche pertaining to Deposit account relationships; provided, that in the event that the Failed Bank maintained one or more duplicate copies of such microfilm or microfiche Records, the Assuming Bank hereby assigns, transfers, and conveys to the Corporation one such duplicate copy of each such Record without cost to the Corporation, and agrees to deliver to the Corporation all Records assigned and transferred to the Corporation under this Article VI as soon as practicable on or after the date of this Agreement. The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

## ARTICLE VII
## BID; INITIAL PAYMENT

The Assuming Bank has submitted to the Receiver a positive bid of $1,888,000,000.00 for the Assets purchased and Liabilities Assumed hereunder (the "Bid Amount"). On the Payment Date, the Assuming Bank will pay to the Corporation, or the Corporation will pay to the Assuming Bank, as the case may be, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following the day of Bank Closing) from and including the day following Bank Closing to and including the day preceding the Payment Date at the Settlement Interest Rate.

## ARTICLE VIII
## PROFORMA

20

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

97

The Assuming Bank, as soon as practical after Bank Closing, in accordance with the best information then available, shall provide to the Receiver a Proforma Statement of Condition indicating all assets and liabilities of the Failed Bank as shown on the Failed Bank's books and records as of Bank Closing and reflecting which assets and liabilities are passing to the Assuming Bank and which assets and liabilities are to be retained by the Receiver. In addition, the Assuming Bank is to provide to the Receiver, in a standard data request as defined by the Receiver, an electronic database of all loans, deposits, and subsidiaries and other business combinations owned by the Failed Bank as of Bank Closing.  See Schedule 3.1a.

## ARTICLE IX
## CONTINUING COOPERATION

    **9.1**   **General Matters**. The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect the purposes hereof.

    **9.2**   **Additional Title Documents**. The Receiver, the Corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith. The Assuming Bank shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Bank. The Assuming Bank shall be responsible for recording such instruments and documents of conveyance at its own expense.

    **9.3**   **Claims and Suits**.

    (a)    The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Bank with respect to which the Receiver has indemnified the Assuming Bank in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Bank with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing. The exercise by the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Bank with respect to any of its obligations under this Agreement.

    (b)    In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district. The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

21

**9.4    Payment of Deposits**. In the event any depositor does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Bank at the time such claim is made. Upon payment by the Assuming Bank to the Receiver of such amount, the Assuming Bank shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**9.5    Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

**9.6    Proceedings with Respect to Certain Assets and Liabilities.**

(a)    In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.

(b)    In addition to its obligations under Section 6.4, the Assuming Bank shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of the Subsidiaries acquired by the Assuming Bank, and (ii) its books and records, the books and records of such Subsidiaries and all Credit Files, and copies thereof. Copies of books, records and Credit Files

22

Washington Mutual Bank
Henderson, Nevada



shall be provided by the Assuming Bank as requested by the Receiver and the costs of duplication thereof shall be borne by the Receiver.

(c)     Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date of the notice of transfer of any Loan by the Assuming Bank to the Receiver pursuant to Section 3.6, the Assuming Bank shall deliver to the Receiver such documents with respect to such Loan as the Receiver may request, including without limitation the following: (i) all related Credit Documents (other than certificates, notices and other ancillary documents), (ii) a certificate setting forth the principal amount on the date of the transfer and the amount of interest, fees and other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) maintained by, owned by, or in the possession of the Assuming Bank or any Affiliate of the Assuming Bank relating to the transferred Loan.

9.7     **Information**. The Assuming Bank promptly shall provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Corporation or the Receiver may request from time to time, and, at the request of the Receiver, make available employees of the Failed Bank employed or retained by the Assuming Bank to assist in preparation of the pro forma statement pursuant to Section 8.1.

## ARTICLE X
## CONDITION PRECEDENT

The obligations of the parties to this Agreement are subject to the Receiver and the Corporation having received at or before Bank Closing evidence reasonably satisfactory to each of any necessary approval, waiver, or other action by any governmental authority, the board of directors of the Assuming Bank, or other third party, with respect to this Agreement and the transactions contemplated hereby, the closing of the Failed Bank and the appointment of the Receiver, the chartering of the Assuming Bank, and any agreements, documents, matters or proceedings contemplated hereby or thereby.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK

The Assuming Bank represents and warrants to the Corporation and the Receiver as follows:

(a)     **Corporate Existence and Authority**. The Assuming Bank (i) is duly organized, validly existing and in good standing under the laws of its Chartering Authority and has full power and authority to own and operate its properties and to conduct its business as now conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Assuming Bank has taken all necessary corporate

23

action to authorize the execution, delivery and performance of this Agreement and the performance of the transactions contemplated hereby.

(b)    **Third Party Consents**. No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in connection with the execution, delivery or performance by the Assuming Bank of this Agreement, other than such consents as have been duly obtained and are in full force and effect.

(c)    **Execution and Enforceability**. This Agreement has been duly executed and delivered by the Assuming Bank and when this Agreement has been duly authorized, executed and delivered by the Corporation and the Receiver, this Agreement will constitute the legal, valid and binding obligation of the Assuming Bank, enforceable in accordance with its terms.

(d)    **Compliance with Law**.

(i)    Neither the Assuming Bank nor any of its Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any State, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Bank or any of its Subsidiaries or any assets of any such Person, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Assuming Bank or of any of its Subsidiaries, or the ownership of the properties of the Assuming Bank or any of its Subsidiaries, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the ability of the Assuming Bank to perform, satisfy or observe any obligation or condition under this Agreement.

(ii)    Neither the execution and delivery nor the performance by the Assuming Bank of this Agreement will result in any violation by the Assuming Bank of, or be in conflict with, any provision of any applicable law or regulation, or any order, writ or decree of any court or governmental authority.

e)    **Representations Remain True**. The Assuming Bank represents and warrants that it has executed and delivered to the Corporation a Purchaser Eligibility Certification and Confidentiality Agreement and that all information provided and representations made by or on behalf of the Assuming Bank in connection with this Agreement and the transactions contemplated hereby, including, but not limited to, the Purchaser Eligibility Certification and Confidentiality Agreement (which are affirmed and ratified hereby) are and remain true and correct in all material respects and do not fail to state any fact required to make the information contained therein not misleading.

## ARTICLE XII
## INDEMNIFICATION

24

*101*

**12.1    Indemnification of Indemnitees.** From and after Bank Closing and subject to the limitations set forth in this Section and Section 12.6 and compliance by the Indemnitees with Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee (1) based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank for which indemnification is provided hereunder in (a) of this Section 12.1 or (2) described in Section 12.1(a) below subject in each case to certain exclusions as provided in (b) of this Section 12.1:

(a)

(1) claims based on the rights of any shareholder or former shareholder as such of (x) the Failed Bank, or (y) any Subsidiary or Affiliate of the Failed Bank;

(2) claims based on the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank or any Affiliate of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank or any Affiliate of the Failed Bank arising prior to Bank Closing;

(3) claims based on the rights of any present or former director, officer, employee or agent as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank;

(4) claims based on any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers, employees or agents as such, or any Subsidiary or Affiliate of the Failed Bank, or the directors, officers, employees or agents as such of such Subsidiary or Affiliate;

(5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Failed Bank, if any;

(6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Bank to continue to perform any service or activity previously performed by the Failed Bank which the Assuming Bank is not required to perform pursuant to this Agreement or which arise under any contract to which the Failed Bank was a party which the Assuming Bank elected not to assume in accordance with this Agreement and which neither the Assuming Bank nor any Subsidiary or Affiliate of the Assuming Bank has assumed subsequent to the execution hereof;

(7) claims arising from any action or inaction of any Indemnitee, including for purposes of this Section 12.1(a)(7) the former officers or employees of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank that is taken upon the specific written direction of the Corporation or the Receiver, other than any action or inaction taken in a manner constituting bad faith, gross negligence or willful misconduct; and

25

/02

(8) claims based on the rights of any depositor of the Failed Bank whose deposit has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to the Corporation or the Receiver in accordance with Section 2.3;

(9) claims asserted by, or derivatively by any shareholder on behalf of, the Failed Bank's parent company based on the process of bidding, negotiation, execution and consummation of the transactions contemplated by this Agreement, provided that (x) the amount of the indemnification paid or payable pursuant to this clause (9) shall not exceed $500,000,000, and (y) the indemnification provided by this clause (9) shall cover only those claims specifically enumerated in the FDIC's approval of the transactions contemplated by this Agreement.

(b)  provided, that, with respect to this Agreement, except for paragraphs (7), (8) and (9) of Section 12.1(a), no indemnification will be provided under this Agreement for any:

(1) judgment or fine against, or any amount paid in settlement (without the written approval of the Receiver) by, any Indemnitee in connection with any action that seeks damages against any Indemnitee (a "counterclaim") arising with respect to any Asset and based on any action or inaction of either the Failed Bank, its directors, officers, employees or agents as such prior to Bank Closing, unless any such judgment, fine or amount paid in settlement exceeds the greater of (i) the Repurchase Price of such Asset, or (ii) the monetary recovery sought on such Asset by the Assuming Bank in the cause of action from which the counterclaim arises; and in such event the Receiver will provide indemnification only in the amount of such excess; and no indemnification will be provided for any costs or expenses other than any costs or expenses (including attorneys' fees) which, in the determination of the Receiver, have been actually and reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim; and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

(2) claims with respect to any liability or obligation of the Failed Bank that is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(3) claims with respect to any liability of the Failed Bank to any present or former employee as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank, which liability is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(4) claims based on the failure of any Indemnitee to seek recovery of damages from the Receiver for any claims based upon any action or inaction of the Failed Bank, its directors, officers, employees or agents as fiduciary, agent or custodian prior to Bank Closing;

(5) claims based on any violation or alleged violation by any Indemnitee of the antitrust, branching, banking or bank holding company or securities laws of the United States of America or any State thereof;

Washington Mutual Bank
Henderson, Nevada

(6) claims based on the rights of any present or former creditor, customer, or supplier as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(7) claims based on the rights of any present or former shareholder as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(8) claims, if the Receiver determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(9) claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;

(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiary or Affiliate of the Assuming Bank;

(11) except as expressly provided in this Article XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Receiver, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Bank or its Subsidiaries or Affiliates;

(12) claims or actions which constitute a breach by the Assuming Bank of the representations and warranties contained in Article XI;

(13) claims arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection;

(14) claims based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Assuming Bank, other than pursuant to this Agreement; and

(15) claims based on, related to or arising from any liability specifically not assumed by the Assuming Bank pursuant to Section 2.5 of this Agreement.

**12.2   Conditions Precedent to Indemnification.** It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Article XII that such

27



Person shall, with respect to any claim made or threatened against such Person for which such Person is or may be entitled to indemnification hereunder:

(a)    give written notice to the Regional Counsel (Litigation Branch) of the Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as practicable after such claim is made or threatened; provided, that notice must be given on or before the date which is six (6) years from the date of this Agreement;

(b)    provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

(c)    cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such claim;

(d)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of such claim, including without limitation the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming indemnification is entitled to indemnification under this Article XII;

(e)    not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

(f)    not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Receiver; and

(g)    take reasonable action as the Receiver may request in writing as necessary to preserve, protect or enforce the rights of the indemnified Person against any Primary Indemnitor.

12.3    **No Additional Warranty**. Nothing in this Article XII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Failed Bank purchased by the Assuming Bank subsequent to the execution of this Agreement by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

28

105

**12.4**    <u>Indemnification of Receiver and Corporation</u>. From and after Bank Closing, the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with any of the following:

(a)    claims based on any and all liabilities or obligations of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, whether or not any such liabilities subsequently are sold and/or transferred, other than any claim based upon any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b)    claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Bank with respect to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a).

**12.5**    <u>Obligations Supplemental</u>. The obligations of the Receiver, and the Corporation as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII are to supplement any amount payable by any Primary Indemnitor to the Person indemnified under this Article XII. Consistent with that intent, the Receiver agrees only to make payments pursuant to such indemnification to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, and all Primary Indemnitors with respect to any item of indemnification under this Article XII exceeds the amount payable with respect to such item, such Person being indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or Corporation's) payments to the extent of such excess.

**12.6**    <u>Criminal Claims</u>. Notwithstanding any provision of this Article XII to the contrary, in the event that any Person being indemnified under this Article XII shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Receiver shall have no obligation hereunder to indemnify such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person.

**12.7**    <u>Limited Guaranty of the Corporation</u>. The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Bank as set forth in this Article XII. It is a condition to the Corporation's obligation hereunder that the Assuming Bank shall comply in all respects with the applicable provisions of this Article XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Article XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Article XII is intended or shall be construed to create any liability or obligation on the part of the Corporation, the United States of America or any department or

29

agency thereof under or with respect to this Article XII, or any provision hereof, it being the intention of the parties hereto that the obligations undertaken by the Receiver under this Article XII are the sole and exclusive responsibility of the Receiver and no other Person or entity.

**12.8   Subrogation.** Upon payment by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver under this Article XII, the Receiver, or the Corporation as appropriate, shall become subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

## ARTICLE XIII
## MISCELLANEOUS

**13.1   Entire Agreement.** This Agreement embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties.

**13.2   Headings.** The headings and subheadings of the Table of Contents, Articles and Sections contained in this Agreement, except the terms identified for definition in Article I and elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**13.3   Counterparts.** This Agreement may be executed in any number of counterparts and by the duly authorized representative of a different party hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

**13.4   GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA, AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK IS LOCATED.

**13.5   Successors.** All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Bank. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

107

**13.6   Modification; Assignment**. No amendment or other modification, rescission, release, or assignment of any part of this Agreement shall be effective except pursuant to a written agreement subscribed by the duly authorized representatives of the parties hereto.

**13.7   Notice**. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given in writing, and delivered in person against receipt therefore, or sent by certified mail, postage prepaid, courier service, telex or facsimile transmission to such party (with copies as indicated below) at its address set forth below or at such other address as it shall hereafter furnish in writing to the other parties. All such notices and other communications shall be deemed given on the date received by the addressee.

**Assuming Bank**

JPMorgan Chase Bank, National Association
270 Park Avenue
New York, New York 10017

Attention: Brian A. Bessey

with a copy to: Stephen M. Cutler

**Receiver and Corporation**

Federal Deposit Insurance Corporation,
Receiver of Washington Mutual Bank, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201

Attention: Deputy Director (DRR-Field Operations Branch)

with copy to: Regional Counsel (Litigation Branch)

**and with respect to notice under Article XII:**

Federal Deposit Insurance Corporation
Receiver of Washington Mutual Bank, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201
Attention: Regional Counsel (Litigation Branch)

**13.8   Manner of Payment**. All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; provided, that in the event the Receiver or the Corporation is obligated to make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

31

Washington Mutual Bank
Henderson, Nevada

108

**13.9**    <u>Costs, Fees and Expenses</u>. Except as otherwise specifically provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including without limitation any fees and disbursements to its accountants and counsel; <u>provided</u>, <u>that</u> the Assuming Bank shall pay all fees, costs and expenses (other than attorneys' fees incurred by the Receiver) incurred in connection with the transfer to it of any Assets or Liabilities Assumed hereunder or in accordance herewith.

**13.10**    <u>Waiver</u>. Each of the Receiver, the Corporation and the Assuming Bank may waive its respective rights, powers or privileges under this Agreement; <u>provided</u>, <u>that</u> such waiver shall be in writing; <u>and</u> <u>further</u> <u>provided</u>, <u>that</u> no failure or delay on the part of the Receiver, the Corporation or the Assuming Bank to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

**13.11**    <u>Severability</u>. If any provision of this Agreement is declared invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

**13.12**    <u>Term of Agreement</u>. This Agreement shall continue in full force and effect until the sixth (6th) anniversary of Bank Closing; <u>provided</u>, <u>that</u> the provisions of Section 6.3 and 6.4 shall survive the expiration of the term of this Agreement. Provided, however, the receivership of the Failed Bank may be terminated prior to the expiration of the term of this Agreement; in such event, the guaranty of the Corporation, as provided in and in accordance with the provisions of Section 12.7 shall be in effect for the remainder of the term. Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to any (i) amount which is owing at the time of such expiration, regardless of when such amount becomes payable, and (ii) breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

**13.13**    <u>Survival of Covenants, Etc</u>. The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

**[Signature Page Follows]**

32

*109*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF: WASHINGTON MUTUAL BANK,
HENDERSON, NEVADA

BY:_____

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

_____

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: _____

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

_____

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION

BY:_____

NAME: Brian A. Bessey
TITLE: Senior Vice President

Attest:

33

Washington Mutual Bank
Henderson, Nevada

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF: WASHINGTON MUTUAL BANK,
HENDERSON, NEVADA

BY: *Mitchell L. Glassman*

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

*David Gearin*

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: *Mitchell L. Glassman*

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

*David Gearin*

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION

BY: _____

NAME: Brian A. Bessey
TITLE: Senior Vice President

Attest:

_____

33

///

## SCHEDULE 2.1 - Certain Liabilities Not Assumed

1. Preferred stock and litigation pending against the Failed Bank related to liabilities retained by the receiver.

2. Subordinated debt.

3. Senior debt.

4. All employee benefit plans sponsored by the holding company of the Failed Bank except the tax-qualified pension and 401(k) plans and employee medical plan.

5. All management, employment, change-in-control, severance, unfunded deferred compensation and individual consulting agreements or plans (i) between the Failed Bank and its employees or (ii) maintained by the Failed Bank on behalf of its employees.

34

112

## SCHEDULE 3.2 - Purchase Price of Assets

'

| | | |
|---|---|---|
| (a) | cash and receivables from depository institutions, including cash items in the process of collection, plus interest thereon: | Book Value |
| (b) | securities (exclusive of the capital stock of Acquired Subsidiaries), plus interest thereon: | Market Value |
| (c) | federal funds sold and repurchase agreements, if any, including interest thereon: | Book Value |
| (d) | Loans: | Book Value |
| (e) | Other Real Estate: | Book Value |
| (f) | credit card business, if any, including all outstanding extensions of credit: | Book Value |
| (g) | Safe Deposit Boxes and related business, safekeeping business and trust business, if any: | Book Value |
| (h) | Records and other documents: | Book Value |
| (i) | capital stock of any Acquired Subsidiaries: | Book Value |
| (j) | amounts owed to the Failed Bank by any Acquired Subsidiary: | Book Value |
| (k) | assets securing Deposits of public money, to the extent not otherwise purchased hereunder: | Book Value |
| (l) | Overdrafts of customers: | Book Value |

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

113

| | | |
|---|---|---|
| (m) | rights, if any, with respect to Qualified Financial Contracts. | Market Value |
| (n) | rights of the Failed Bank to provide mortgage servicing for others and to have mortgage servicing provided to the Failed Bank by others and related contracts. | Book Value |
| (o) | Bank Premises: | Book Value |
| (p) | Furniture and Equipment: | Book Value |
| (q) | Fixtures: | Book Value |

36

154

## SCHEDULE 3.5 - Certain Assets Not Purchased

(1)     Any Financial Institution Bonds, Banker's Blanket Bonds, surety bonds (except Court bonds required for retained litigation risk), Directors and Officers insurance, Professional Liability insurance, or related premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing. This shall exclude Commercial General Liability, International Liability, Commercial Automobile, Worker's Compensation, Employer's Liability, Umbrella and Excess Liability, Property, Mortgage Impairment and Mortgage Errors & Omissions, Lender-placed coverage, Private Mortgage Insurance, Boiler & Machinery, Terrorism, Mail, Storage Tank Liability, Marine Liability, Vessel Hull and Vessel Pollution (if marine assets are acquired), Aircraft Liability (if aircraft assets are acquired) insurance policies, proceeds and collateral related to, held or issued with respect to or in connection with any Asset (including Bank staff) acquired by the Assuming Bank under this Agreement, which such policies, proceeds and collateral are acquired Assets.

(2)     any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

(3)     leased Bank Premises and leased Furniture and Equipment and Fixtures and data processing equipment (including hardware and software) located on leased or owned Bank Premises, if any; provided, that the Assuming Bank does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto; and

(4)     any criminal/restitution orders issued in favor of the Failed Bank;

37

115

## EXHIBIT 3.2(c) – VALUATION OF CERTAIN
## QUALIFIED FINANCIAL CONTRACTS

**A.**   **Scope**

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

**B.**   **Exclusions**

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Bank but are not subject to adjustment from Book Value.

**C.**   **Adjustment**

The difference between the Book Value and market value as of Bank Closing.

**D.**   **Methodology**

1.   The price at which the Assuming Bank sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Bank and the Receiver.

2.   In valuing all other Qualified Financial Contracts, the following principles will apply:

   (i)   All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

   (ii)   All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

   (iii)   Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

116

(iv)     For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., The Wall Street Journal, Telerate, Reuters or other similar source) or regularly traded exchanges.

(v)      For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Bank as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Bank will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

117

## Status of Washington Mutual Bank Receivership

On September 25, 2008, the Federal Deposit Insurance Corporation was appointed the Receiver ("Receiver") of Washington Mutual Bank ("WAMU"). The Receiver transferred substantially all WAMU's assets and liabilities to JPMorgan Chase Bank, N.A. ("JPMC") pursuant to a Purchase and Assumption Agreement dated September 25, 2008 - PDF ("P&A Agreement"). Since WAMU failed, the Receiver has been a party to a number of major litigation matters.

### Bankruptcy Litigation

On the day after WAMU failed, its holding company, Washington Mutual Inc. ("WMI"), filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware (assigned to Judge Mary F. Walrath). Thereafter, WMI, JPMC, the FDIC in its Corporate capacity ("FDIC-C"), and the Receiver became involved in several lawsuits contesting the ownership of over $20 billion in assets.

The parties reached a settlement in the WMI bankruptcy proceeding that was approved by the FDIC's Board of Directors on May 20, 2010, and WMI filed a plan of reorganization incorporating the terms of the settlement ("WMI Bankruptcy Settlement"). Several parties objected to WMI's proposed plan, and in particular, WMI's proposal to release its claims against JPMC, FDIC-C, and the Receiver. At the request of WMI's equity holders, the Bankruptcy Court appointed an Examiner to thoroughly investigate WMI's claims against JPMC, FDIC-C, and the Receiver, and to determine whether the proposed settlement (which would release these claims) was fair and equitable to WMI. The Examiner found that the WMI Bankruptcy Settlement was a fair resolution.

On February 24, 2012, the Bankruptcy Court entered an order confirming the seventh amended plan - PDF proposed by WMI and its co-debtor WMI Investment Corp (the "Plan"). The WMI Bankruptcy Settlement - PDF, as amended from time to time, remains integral to and incorporated in the Plan. The Plan and Settlement became effective on March 19, 2012. The Receiver received $843.9 million pursuant to the terms of the WMI Bankruptcy Settlement.

### Litigation filed by DBNTC and JPMC and Settlement

Soon after WAMU failed, Deutsche Bank National Trust Co. ("DBNTC") sued the Receiver and JPMC, claiming $6 billion to $10 billion in damages arising out of WAMU's alleged breach of representations and warranties made in connection with mortgages sold to securitized trusts. (Amended Complaint - PDF.) In June 2015, the United States District Court for the District of Columbia issued a partial summary judgment decision finding that the Receiver retained liability for DBNTC's claims to the extent that such claims were not reflected at a stated book value in the financial accounting records of WAMU as of the failure date. (Amended Memorandum Opinion - PDF.) The Receiver sought appellate review of the decision in the United States Court of Appeals for the District of Columbia Circuit.

Also, JPMC filed lawsuits and cross-claims seeking indemnification against the Receiver and FDIC-C (Indemnification lawsuit - PDF) and submitted over 100 notices of potential indemnity claims. (Notices can be found at Group 1: JPMorgan Chase Notices relating to Washington Mutual Whole Bank P&A - PDF in the Freedom of Information Act (FOIA) Service Center Reading Room and, JPMorgan Chase Notices relating to Washington Mutual Bank Whole Bank P&A, at Group 2: JPMorgan Chase Notices relating to Washington Mutual Whole Bank P&A).

On August 19, 2016, the FDIC Board of Directors approved a settlement among the Receiver, FDIC-C, DBNTC, and JPMC, to settle the lawsuit filed by DBNTC, the Indemnification lawsuit filed by JPMC and all claims for indemnification made by JPMC against the Receiver, including two other lawsuits disputing JPMC's responsibility for tax liabilities of the failed WAMU ("DBNTC-JPMC-FDIC Settlement"). Under its terms, the FDIC-JPMC-DBNTC settlement became effective only if DBNTC obtained court approval of the settlement. On June 30, 2017, the Superior Court of Orange County, California entered an order approving the settlement, and that order became final and unappealable on September 5, 2017. Under the settlement agreement, in exchange for releases from JPMC and DBNTC, the Receiver paid JPMC $645 million and issued DBNTC an allowed unsecured receivership claim of $3,006,929,600 on September 8, 2017. The DBNTC-JPMC-FDIC Settlement agreement can be found at this link: DBNTC-JPMC-FDIC Settlement agreement - PDF.

As a result of the settlement, the parties dismissed certain lawsuits pending in the district court and an appeal pending in the court of appeals. These lawsuits had been stayed while DBNTC obtained approval of the settlement by the California state court.

### Interim Dividend Distribution

As of June 30, 2017, the Receiver had approximately $2.76 billion to distribute to holders of claims allowed by the receivership, according to the priorities established in 12 U.S.C. § 1821(d)(11)(A). The most recent receivership balance sheet summary can be found at the following link: (WAMU Quarterly Receivership Balance Sheet Summary). After paying JPMC in full, the Receiver made an interim dividend distribution on September 26, 2017, on all approved senior unsecured claims of the receivership, including the claims of DBNTC, general trade creditors, and the WAMU senior bondholders. This distribution represented approximately 95% of the receivership's remaining total current assets. The allowed senior unsecured creditors shared equally (on a pro rata basis) in this distribution. The remaining funds in the receivership are expected to be sufficient to cover future expected and potential losses and expenses.

The settlement did not resolve certain claims by the Receiver against JPMC, including the Receiver's claims against JPMC relating to its alleged participation with other banks in manipulating certain benchmark rates and markets (LIBOR, interest rate swaps, ISDAfix, treasury securities, credit default swaps, and foreign exchange rates). It also preserves all claims of the Receiver against other persons who caused losses to WAMU prior to its failure, including claims relating to restitution orders and all regulatory and supervisory claims of FDIC-C. The Receiver anticipates that it will make a final distribution at a later date. It is unlikely that the Receiver will have sufficient funds to distribute to holders of receivership certificates issued to WAMU subordinate note holders or equity holders.

WAMU, which was the largest failure of an insured depository institution in the history of the FDIC, had $307 billion assets, $188 billion deposits, and over 2,300 branches in fifteen states when it failed. JPMC acquired substantially all of WAMU's assets from the FDIC, paid about $1.9 billion, and assumed all of the deposits and "substantially all other liabilities" of WAMU. The resolution of WAMU through the P&A Agreement was completed at no cost to the Deposit Insurance Fund.

---

Last Updated: 09/25/2017

cservicefdicdal@fdic.gov



EXHIBIT ✓

**WaMu**®

908-B

Please allow 7-10 days for postal delivery.

| | | |
|---|---|---|
| Payment Due Date: | | April 01, 2009 |
| Current Payment: | $ | 2,774.88 |
| Total Amount Due: | $ | 6,443.98 |
| If Received After: | | April 16, 2009 |
| Total Amount Plus Late Charges: | $ | 6,582.72 |

JOHNNY RAY MOORE

Loan Number:                    5304282923
Statement Date:              March 18, 2009

Please write your loan number on your check.
Make check payable to Washington Mutual.

☐  Please check here if change of address or telephone
    number is indicated on the reverse side of this form.

*Making Your Payment*
*Please write in any additional funds that you may be including*
*with your payment. If you include additional funds and do not*
*indicate how to apply them, we will apply them first to*
*applicable advances, then to any fees due and then to principal.*

| | | |
|---|---|---|
| Late Charges | + | _____ |
| Additional Principal | + | _____ |
| Additional Escrow | + | _____ |
| Future Payments | + | _____ |
| Total Amount Enclosed | = | _____ |

WASHINGTON MUTUAL
PO BOX 78148
PHOENIX AZ 85062-8148

0735870 0481007 0000000 5304282923 0644398 0013874 0277488 0

120

EXHIBIT _K_

(2/

# Washington Mutual

P.O. Box 100590
Florence, SC 29501-0590

**Insurance Center**
phone   866.310.4237
fax      843.413.2048
www.WaMu.com

08/17/2009

JOHNNY RAY MOORE
15 SACHEM DR
SHELTON, CT  06484-1756

Subject:                                          Property Address:
    Washington Mutual Bank                    15 SACHEM DR
    ("Washington Mutual")                     SHELTON, CT  06484
    Loan Number 5304282923
Hazard Insurance:
    **Expiration Date** 06/04/2009
    **NOTICE OF LENDER-PLACED INSURANCE**

Dear  JOHNNY RAY MOORE

As we explained in two previous letters, Washington Mutual requires the maintenance of a hazard insurance policy to protect our mutual interest in your property.  Although we have sent prior requests for a copy of your renewed/reinstated hazard insurance policy, we have not yet received proof of your coverage.

Therefore, lender-placed coverage has been ordered, and the enclosed policy's annual premium of $ 8,079.00 has been billed to an impound/escrow account established for your loan.  Please read the policy carefully to make sure you understand its terms and conditions.  Some or all of the coverage and premiums for this lender-placed insurance will be reinsured through an insurance company that is an affiliate of Washington Mutual.

**We strongly urge you to contact an agent of your choice to obtain the coverage you need at a more competitive price.**  The insurance ordered on your property:

- **Will have significantly higher premiums than standard insurance premiums** because our carrier has issued the policy without the benefit of normal underwriting guidelines.
- Covers only the building.  The policy **does not provide any coverage** for loss or damage to personal property, loss from theft or injury to persons or property for which you may be liable, or loss due to earthquake or flood.

**As you can see, you will save money and be better protected with an insurance policy through your own agent.**  When we receive proof of acceptable insurance coverage, we will cancel the ordered policy, and you will only be charged for any time during which your own hazard insurance policy was not in effect.

For your convenience, we've provided our property insurance requirements on the next page for your insurance agent to review.  To ensure continued coverage, here's all you need to do:

122

(Continued)

---

Cut and return with **Proof** of Tax Payment

<u>NOTE: DO NOT SEND TAX OR MORTGAGE PAYMENTS TO THIS ADDRESS. REMIT TAX PAYMENTS TO LOCAL TAX AGENCY. SEND MORTGAGE PAYMENTS TO THE ADDRESS ON YOUR BILLING STATEMENT.</u>

Order Number: 48712221
Loan Number: 5304282923

Base Amount: $6,338.94

Parcel: 159. - 50.  /
Shelton City     *
203-924-1555

Washington Mutual Home Loans Inc - 0043001
P.O. Box 961247
Ft. Worth, TX 76161-0247

RG1

4-10  *123*



# Washington Mutual
## HOME LOANS

3/10/2009

Johnny Ray Moore
15 Sachem Dr
Shelton, CT 06484-1756

Re: Washington Mutual Loan Number: 5304282923
    Parcel Number: 159. - 50.  /
    Property Address: 15 Sachem Drive

Dear Johnny Ray Moore and/or :

Washington Mutual is committed to providing you with helpful and responsive home loan service. As part of that commitment, we are writing to you about an issue concerning your property taxes.

We have recently been informed that the property taxes on your home have not been paid. We do not maintain an escrow account for the payment of these taxes; therefore, you are responsible for paying all property taxes and special assessments as they become due. If you fail to pay your property taxes, you could be considered in default and risk losing your home.

| --Parcel No.-- | Year | Instl | Base Amt | ----Payee---- | |
|---|---|---|---|---|---|
| 159. - 50.  / | 2008/2008 | T | $6,338.94 | Shelton City | * |

To avoid defaulting on your loan, you must send your tax payment to your local tax collector's office.  We must receive proof of the tax payment within 30 days of receipt of this letter. As proof of payment, we accept a paid receipt from the taxing authority or a copy of the front and back of your canceled check. Please mail your proof of payment to the address listed in the coupon below.

As your lender, we have an interest in ensuring that your property taxes are paid on time. If we do not receive proof of payment within 30 days, we may pay the delinquent taxes to protect our interests in your property.  If we must pay the taxes, please note that:

*We will send you a bill for the total amount paid. You will have 30 days to repay us before further action is taken.
*We may establish an escrow account on your loan to pay any future tax bills. An escrow account requires you to make monthly payments into the account that will be used to pay your annual tax bills as they become due.

If you have any questions, please call our Customer Service Department toll free at 1-866-926-8937.  Thank you for your prompt attention to this serious matter.

Sincerely,

Tax Research Department
Washington Mutual Bank

If you are in bankruptcy or you have been discharged in bankruptcy, this letter is for informational purposes only and is not intended as an attempt to collect a debt or as an act to collect, assess or recover all or any portion of the

For prompt service when writing or calling about this account, please use this address: Washington Mutual Bank, P.O. Box 100576, Florence, SC 29502-0576; or you may phone our Enterprise Contact Center toll free at (866) 926-8937.  Always provide your loan number 5304285561.

Washington Mutual Bank
Special Loans Department

01/22/09

#BWNCLNN
#3953049282992393#
20090124 N 0-0
245
JOHNNY RAY MOORE
15 SACHEM DR
SHELTON  CT 06484-1756

IlIlllll.Illl.I.llll.l.l.lllll.llll.llllll.llllllllllll.l.l.lll.l

0-0

Dear Borrower:                                    Re: Loan No. 5304282923

The terms of your adjustable mortgage loan provide for the following changes:

The payment of your mortgage loan is scheduled to be adjusted for the payment due on
03/01/09. This new payment consists of a principal and interest amount of $2,774.88.
This payment amount is based on a rate of 4.12500%, a remaining term of 336 months and a
projected principal balance of $779,544.17. This does not include payment for taxes and
insurance(s).

Your new payment was determined by the payment amount adjustment limitation provision
contained in your Promissory Note.  If this limitation had not been in effect, your new
payment amount would have been $3,915.85, an amount which would fully amortize the loan
at the new interest rate over the remaining loan term.

Assuming that all regularly scheduled payments (if any) are made between now and
03/01/09, your balance will be $779,544.17.

The interest rate effective 02/01/09 used to calculate the new payment was 4.12500%.

This interest rate was based on the MONTHLY AVG OF 1 YR US TREASURY CONSTANT MATURITY
index value of 1.82166% published on 01/05/09.

Your next scheduled payment review date is 01/22/10.  Any new payment amount will be
due for the first time on 03/01/10.

The interest rate on your mortgage loan is scheduled for adjustment prior to your next
payment review.  The dates your interest rate will be adjusted during this period begin
on 03/01/09 and every 1 month(s) thereafter.

Since your last payment adjustment, the interest rate on your mortgage loan has been
adjusted on the following dates:

| PREVIOUS ADJUSTMENT DATE | PREVIOUS INTEREST RATE | PREVIOUS INDEX VALUE USED |
|---|---|---|
| 02/01/09 | 4.25000% | 2.05250% |
| 01/01/09 | 4.50000% | 2.25500% |
| 12/01/08 | 4.75000% | 2.47833% |
| 11/01/08 | 4.87500% | 2.66416% |
| 10/01/08 | 5.12500% | 2.85500% |
| 09/01/08 | 5.37500% | 3.07833% |
| 08/01/08 | 5.50000% | 3.29000% |
| 07/01/08 | 5.75000% | 3.52833% |
| 06/01/08 | 6.00000% | 3.79416% |
| 05/01/08 | 6.37500% | 4.07583% |
| 04/01/08 | 6.62500% | 4.32583% |
| 03/01/08 | 6.75000% | 4.52166% |

126

EXHIBIT L

127

oo

# CITY/TOWN CLERK

54 HILL STREET
SHELTON, CT 06484
PHONE: 203-924-1555, EXT. 1377
FAX: 203-924-1721



November 15, 2017

To whom it may concern:

The index page attached referenced as "Exhibit A" can be found on our public land records; it refers to a mortgage document also attached and referenced as "Exhibit B". As you will notice on Exhibit A, there is an <u>instrument</u> number as well as a <u>book and page</u> used to locate the document, Exhibit B, within our records. You will also notice a <u>recording date and time,</u> along with the <u>description</u> of the type of document which in this case is a mortgage.

The <u>OR Party</u> represents the borrower in this specific mortgage document, Johnny Ray Moore,  while the <u>EE Party</u> represents the lenders which in this case is Mortgage Electronic Registration Systems, and Mortgage Capital Associates, Inc.  The <u>Description</u> refers to the property address at hand and <u>Return name/address</u> refers to the individual or company the document is returned to after recording.  Finally, <u>Related,</u> references documents along with their book and page, which have any relation to the document being viewed.

Please note, the information viewed on our index pages are extracted directly from the land record document at hand.

Sincerely,

*Margaret R. Domorod*

Margaret R. Domorod, City/Town Clerk

Personally appeared before me Margaret R.
Domorod, on this day November 15, 2017.  In
the City of Shelton, Connecticut.

128 *Diara M Barry notary exp 10/31/2022*

| | |
|---|---|
| **Instr #:** | 2007-674 |
| **Book/Page:** | 2780 / 255 |

*Exhibit "A"*

| | |
|---|---|
| **Rec Date:** | 01/30/2007  14:18:00 |
| **Doc Grp/Desc:** | LR / MORTGAGE |

**OR Party:**    MOORE JOHNNY RAY

**EE Party:**    MERS
                 MORTGAGE CAPITAL ASSOCS, INC

**Document Date:**

**Description:**    15 SACHEM DR

*Exhibit "B"*

After Recording Return To:
MORTGAGE CAPITAL ASSOCIATES, INC.
11150 WEST OLYMPIC BOULEVARD, #1160
WEST LOS ANGELES, CALIFORNIA 90064
Loan Number: 07010208

**BK: 02780 PG: 255
Inst# 674**

——————————— [Space Above This Line For Recording Data] ———————————

## OPEN-END MORTGAGE DEED

**MIN:** 1001330-0100057337-4

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated   JANUARY 26, 2007   , together with all Riders to this document.
**(B)** "**Borrower**" is   JOHNNY RAY MOORE

Borrower is the mortgagor under this Security Instrument.
**(C)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "**Lender**" is   MORTGAGE CAPITAL ASSOCIATES, INC.

Lender is a   CALIFORNIA CORPORATION, IT'S SUCCESSORS AND/OR ASSIGNS     organized and existing under the laws of   CALIFORNIA
Lender's address is   11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064

**(E)** "**Note**" means the promissory note signed by Borrower and dated   JANUARY 26, 2007
The Note states that Borrower owes Lender   SEVEN HUNDRED FORTY-SIX THOUSAND FIVE HUNDRED FIFTY AND 00/100   Dollars (U.S. $ 746,550.00     ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than FEBRUARY 1, 2037
**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS      **DocMagic** *eFormns* 800-649-1362
Form 3007 01/01                                    Page 1 of 13                                                       *www.docmagic.com*

I HEREBY CERTIFY THAT THIS IS A TRUE COPY OF
THE ORIGINAL DOCUMENT RECEIVED FOR RECORD
IN THE OFFICE OF THE CITY/TOWN CLERK OF THE
CITY OF SHELTON ON 1/30/07 AT 2:17 P.M.
ATTEST: _____
CITY/TOWN CLERK

130

BK: 02780 PG: 256

Inst# 674

**(H)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- ☒ Adjustable Rate Rider
- ☐ Balloon Rider
- ☐ 1-4 Family Rider
- ☐ Condominium Rider
- ☐ Planned Unit Development Rider
- ☐ Biweekly Payment Rider
- ☐ Second Home Rider
- ☒ Other(s) [specify]
  PREPAYMENT RIDER TO SECURITY INST

**(I)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** **"Escrow Items"** means those items that are described in Section 3.

**(M)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the          COUNTY          of          FAIRFIELD          :
                    [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                    Page 2 of 13

DocMagic *Perform* 800-649-1362
www.docmagic.com

r3/

CV3007.mzd

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N.: MAP 159 LOT 50

BK: 02780 PG: 257
Inst# 674

which currently has the address of   15 SACHEM DRIVE

[Street]

SHELTON                          , Connecticut   06484   ("Property Address"):
[City]                                            [Zip Code]

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim

/ 2 2       Ct3007.mzd

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01
Page 4 of 13
*DocMagic* 800-649-1362
www.docmagic.com

/ 3 3

Ct3007.mzd

BK: 02780 PG: 259

Inst# 674

in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any

134   C13007.mzd

BK: 02780 PG: 260
Inst# 674

form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.  Occupancy.**  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.  Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.  Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          DocMagic *eFarms* 800-649-1362
Form 3007 01/01                                       Page 6 of 13                                            www.docmagic.com

135      C3007.mvd

BK: 02780 PG: 261
Inst# 674

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

136   CO3007.mzd

BK: 02780 PG: 262
Inst# 674

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

137
C3007.mrd

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

BK: 02780 PG: 264
Inst#674

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

---

*139*

C3007.mzd

BK: 02780 PG: 265

state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01
Page 11 of 13
DocMagic @Forms 800-649-1362
www.docmagic.com

140   C3007.mzt

immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

25. **Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)                    _____ (Seal)
JOHNNY RAY MOORE                    -Borrower                                            -Borrower

_____ (Seal)                    _____ (Seal)
                                    -Borrower                                            -Borrower

_____ (Seal)                    _____ (Seal)
                                    -Borrower                                            -Borrower

Signed, sealed and delivered in the presence of:

_____                           _____
Witness    Joseph Mamie                                   Witness:    Mark A. Kissel

---

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01
Page 12 of 13
DocMagic eForms 800-649-1362
www.docmagic.com

BK: 02780 PG: 267
Inst# 674

# SCHEDULE A

## PROPERTY DESCRIPTION

ALL THAT CERTAIN piece or parcel of land, together with the buildings and improvements thereon, situated in the City of Shelton, County of Fairfield and State of Connecticut, being shown and designated as Lot No. 25 on a certain map entitled, "Record Subdivision Plan Vistas at White Hills East Village Road, Sachem Drive & Sagamore Road Situated in City of Shelton, Connecticut", prepared by Eastern States Engineering, Inc., Scale 1"=100', Date: 4-02-04, which map is on file in the Shelton Town Clerk's Office as Map No. 4110, to which reference may be had for a more particular description thereof.

142

State of Connecticut
County of  FAIRFIELD                          ss: Trumbull

The foregoing instrument was acknowledged before me this  January 26, 2007
    JOHNNY RAY MOORE

_____
Signature of Person Taking Acknowledgment
Joseph F. Varrone, Jr.
_____
Commissioner of the Superior Court
Title

_____
Serial Number, if any

(Seal)                        My commission expires _____

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS    DocMagic *eFormss* 800-649-1362
Form 3007 01/01                              Page 13 of 13                                    www.docmagic.com

143
Ct3007.mzd

BK: 02780 PG: 269

Loan Number: Inst# 00074 8

# ADJUSTABLE RATE RIDER
### Payment Option

THIS ADJUSTABLE RATE RIDER is made this 26th day of JANUARY, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned
(the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to MORTGAGE
CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

15 SACHEM DRIVE, SHELTON, CONNECTICUT 06484

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT
THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE
PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT
ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE
NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the
Note is called the "Note Holder."

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**
**(A) Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will
initially pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default
described in Section 7(B) of the Note.
**(B) Interest Rate Change Dates**
The interest rate I will pay may change on the 1st day of MARCH, 2007 ,
and on that day every month thereafter. Each date on which my interest rate could change is called an
"Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change
Date. Although the interest rate may change monthly, my monthly payment will be recalculated in
accordance with Section 3.
**(C) Interest Rate Limit**
My interest rate will never be greater than 9.950 %.

---

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                    Page 1 of 5

DocMagic eForms 800-649-1362
www.docmagic.com

144

Usrpoen.rid

BK: 02780 PG: 270
Inst# 674

**(D) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 250/1000        percentage point(s) (     2.250  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

**3.  PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the        1st        day of each month beginning on MARCH 1, 2007               . I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on FEBRUARY 1, 2037           , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064

or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $ 2,401.20            , until a new Minimum Payment is required as provided below.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the 1st   day of MARCH, 2008            , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                    Page 2 of 5                    DocMagic *eForms* 800-649-1362
www.docmagic.com

145   Usrpum.rfc

BK: 02780 PG: 271
Inst# 674

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G) Required Full Payment**

Regardless of the Payment Change Cap, on the  fifth  Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

    **(i)**   **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

---

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                                Page 3 of 5

*DocMagic €Ramms* 800-649-1362
www.docmagic.com

176          Usrpon.rfc

     **(ii)  Fully Amortized Payment:**  the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments.  This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

     **(iii)  15 Year Amortized Payment:**  the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

<u>Payment Options will only be available if they are greater than the Minimum Payment.</u>

**(I)  Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4.  NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if:  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

---

DocMagic *eForms* 800-649-1362
www.docmagic.com

*147*

BK: 02780 PG: 273
Inst# 674

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Johnny Ray Moore_____ (Seal)          _____ (Seal)
JOHNNY RAY MOORE              -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                              -Borrower                                          -Borrower

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                    Page 5 of 5

DocMagic *eFasmus* 800-649-1362
www.docmagic.com

BK: 02780 PG: 274
Inst# 674

# PREPAYMENT RIDER

Loan Number: 07010208

Date: JANUARY 26, 2007

Borrower(s): JOHNNY RAY MOORE

THIS PREPAYMENT RIDER (the "Rider") is made this 26th    day of JANUARY        ,
2007                    , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

15 SACHEM DRIVE, SHELTON, CONNECTICUT 06484

[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.     PREPAYMENT CHARGE**
The Note provides for the payment of a prepayment charge as follows:

**5   . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**
I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment." When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note. However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.
If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment. However, any reduction due to my partial Prepayment may be offset
by an interest rate increase. If this Note provides for a variable interest rate or finance
charge, and the interest rate or finance charge at any time exceeds the legal limit under

---

DocMagic €Forms 800-649-1362
www.docmagic.com

149

User.rpf

BK: 02780 PG: 275
Inst# 674

which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within TWENTY-FOUR  ( 24 ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX  ( 6 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)          _____ (Seal)
JOHNNY RAY MOORE            -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                            -Borrower                                              -Borrower

MULTISTATE PREPAYMENT RIDER
6/03                                    Page 2 of 2                  DocMagic eForms 800-649-1362
                                                                    www.docmagic.com

Received for Record   1/30/2007
At 2 H. 17 M. and Recorded by
_____ Ass't Town Clerk

150

Uspr.ppf